**PETER KIEWIT SONS' COMPANY,**
Appellant,

v.

**SUMMIT CONSTRUCTION COMPANY**
and General Insurance Company of
America, Appellees.

**SUMMIT CONSTRUCTION COMPANY**
and General Insurance Company of
America, Appellants,

v.

**PETER KIEWIT SONS' COMPANY,**
Appellee.

**GENERAL INSURANCE COMPANY OF
AMERICA, Appellant,**

v.

**PETER KIEWIT SONS' COMPANY,**
Appellee.

Nos. 18559–18561.

United States Court of Appeals
Eighth Circuit.

Nov. 26, 1969.

W. A. McCullen and Joseph M. Butler of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S. D., for Peter Kiewit Sons' Co.

Horace R. Jackson of Whiting, Lynn, Jackson, Freiberg & Shultz, Rapid City, S. D., for Summit Construction Co.; Kelton S. Lynn and Gene N. Lebrun, Rapid City, S. D., with him on the briefs.

H. R. Hanley, Rapid City, S. D., for General Ins. Co. of America; H. H. Halstead, Seattle, Wash., with him on the briefs.

Before VAN OOSTERHOUT, Chief Judge, GIBSON, Circuit Judge, and MILLER, Senior District Judge.

FLOYD R. GIBSON, Circuit Judge.

These appeals are from judgments entered by and from rulings of the District Court of the District of South Dakota made in a protracted jury trial[1] on the issues presented in the complaint of Summit Construction Company, a South Dakota corporation, against Peter Kiewit Sons' Company, a Nebraska corporation, and the counterclaim of Kiewit against Summit and General Life Insurance Company, a Washington corporation and surety for Summit. Monetary judgments were rendered against Kiewit in the amount of $1,097,856.47.[2]

---

1. The case was tried by the Honorable Fred J. Nichol, United States District Judge. The trial commenced July 19, 1965 and concluded its first phase on the issues of liability on October 5, 1965. The second phase on the damages issues started November 1, 1965 and concluded on February 11, 1966. The same jury heard the bifurcated trial.

2. The Special Verdicts rendered by the jury are:

No. 1 for $269,546.17 for the breach of the basic Subcontract.

No. 2 for $412,173.45 for the reasonable value of the backfill work completed by Summit to June 30, 1962, in the changed manner and method required by Kiewit.

No. 3 for $74,524.71 for extra labor costs including extra wages, wage increases and subsistence, and payroll and overhead costs.

No. 4 for $16,933.22 for equipment and material which Summit left on the job and for which Kiewit has not compensated Summit.

No. 5 for $81,083.47 for the reasonable value of the equipment used by Summit in Kiewit's behalf during the force account period of July 1, 1962 through July 14, 1962.

Kiewit has appealed [3] from the monetary judgment for breach of contract on the ground that the evidence was insufficient to justify the jury verdict and therefore urges that the judgment be reversed with directions that the matter be retried on the issues presented in Kiewit's counterclaim. Kiewit also argues that even if the general verdict for Summit is sustained on appeal, the several verdicts of the jury must be significantly modified.

Summit has cross-appealed [4] from the trial court's refusal to submit to the jury as consequential damages the following items: (1) Summit's loss of future profits; (2) the attorney's fees and costs and investigative expense incurred by General and charged to Summit under the indemnity agreement made as a condition to the bond; and (3) the attorney's fees and costs incurred by Summit in disputes with its subcontractors arising as a consequence of Kiewit's breach of contract.

General Insurance has also cross-appealed [5] from the trial court's refusal to enter a judgment completely exonerating General under its surety contract. Complete exoneration is sought on alternative grounds. General contends it should be released since there was never a valid contract between Kiewit and Summit as there was no meeting of the minds and, assuming arguendo that there was a contract between Kiewit and Summit, the changes were so substantial and General's risks so increased as to constitute a departure from its contract and bond.

The three appeals arising from this diversity case were consolidated for submission and oral hearing but, insofar as they can be separated, will be considered separately and in order of their docketing in this court.

The facts giving rise to Summit's complaint and Kiewit's counterclaim stem from a Subcontract executed on August 21, 1961 between Kiewit and Summit for site work, excavation and backfill on a Minuteman Missile Project at Ellsworth Air Force Base near Rapid City, South Dakota. On August 1, 1961 Kiewit was awarded the prime construction contract on the project by the United States Government's contracting agency. The project involved the construction of 150 underground launch facilities (hereinafter referred to as missile sites) and 15 underground launch control centers within an area 140 miles long and 90 miles wide near Rapid City, South Dakota. The project consisted of 15 flight groups, with 10 missile sites plus 1 launch control center constituting a flight. The 10 missile sites in each flight were positioned along the circumference of a rough circle several miles in diameter around a central control center

No. 6 for $7,288.38 for extra work removal of slough and debris from the work sites.

Nos. 7 and 8 for $942.74 and $73.34 respectively for extra work in removal of slough and debris.

No. 9 for $8,218.46 for the reasonable value of select material furnished in addition to that required by the Subcontract.

No. 10 for $12,976.06 for extra select material.

No. 11 for $6,782.90 for the reasonable value of extra grading work done by Summit outside the Subcontract.

No. 12 for $187.82 for the reasonable value of the extra work done by Summit in providing access roads to certain sites in response to a specific written request of Kiewit.

No. 13 for $470.12 for the reasonable value of extra work done by Summit with regard to repairing two fences and for an engineering change by Kiewit on setting stakes.

No. 14 for $11,836.77 for additional backhoe excavation done by Summit at the Subcontract price of 40 cents per cubic yard.

No. 15 for $4,632 for the work performed by Summit on change orders Nos. 1, 3 and 4 prior to June 30, 1962.

The Judgment awarded Summit $907,669.61, the total of the Special Verdicts and $190,186.86, the total pre-judgment interest. The total monetary judgment is for $1,097,856.47 with interest thereon at the rate of 6 per cent from February 11, 1966 as provided by law.

3. Case No. 18559.

4. Case No. 18560.

5. Case No. 18561.

and were connected with each other and with the control center by underground cable.

A control center consisted generally of a large reinforced underground concrete structure, with surface housing, protective fencing, parking and roadway. A missile site was essentially comprised of three structures: (1) a waterproof concrete tube (hereinafter referred to as the silo) 14 feet in diameter extending from approximately 80 feet below natural ground level[6] to the finished construction ground surface 4 feet above natural ground level; (2) a concrete cylinder nearly 10 feet in width called an equipment room was built around the silo and encased the silo from the -32 foot level to the finished construction ground surface (the silo and equipment room measured together had a diameter of about 34 feet); and (3) a 16x32x16 foot underground support building extending from the -12 foot level to the finished construction ground surface located approximately 18 feet from the equipment room.

The various mechanical and electrical installations housed in the equipment room were connected by conduits to the support building. The lowest point at which the conduits left the equipment room was -28 feet, with most of the conduits leaving at the -22 foot level and entering the support building at close to natural ground level. Although surface construction of protective fencing, parking area and roadway was negligible, other minor structures such as jack pads and closure tracts were constructed at certain levels in the excavated area.

Summit's initial bid covered only site work and excavation and excluded the backfill work, but the executed Kiewit-Summit Subcontract covered both excavation and backfill at the 150 missile sites and the 15 launch control centers. Inasmuch as the contractual dispute does not centrally involve the work concerning the control centers, that part of the Subcontract will receive only passing consideration. Therefore, for the purpose of this opinion, Summit's responsibilities consisted of clearing the missile sites, stockpiling the turf, excavating to the -32 foot level, and backfilling and compacting from the -32 foot level after completion of the silo, equipment room and support building. When it became apparent that Summit would have to accept the backfill work in order to get the Subcontract, Summit requested that an additional provision be inserted to clarify Summit's backfill duties as it was cognizant of the difficulties in backfilling with pipe in the backfill area from observation of backfill operations at the Malmstrom Minuteman Project in Montana and at an earlier Titan missile project with which Summit had been connected. The provision added by Kiewit read as follows:

"7. Backfill containing electrical and mechanical facilities to be done in the following manner:

"The backfill is to be brought up to approximately one (1) foot above the pipe.

"The mechanical and electrical Subcontractors[7] are to excavate, lay pipes, & etc., and compact the backfill around and above the pipes, conduit, & etc. before this Subcontractor continues his operation."

The lump sum contract price of $2,601,-315 was agreed upon and the Subcontract executed on August 21, 1961.

The agreed method of construction permitted Summit to excavate the first

---

6. Elevations within the excavation were measured in different ways, but natural ground level was the common measuring point. Ground level was assumed to be 1000. An elevation 4 feet below ground level was referred to as either 996 or –4.

7. Kiewit subcontracted other work in connection with the missile sites, as follows:

(1) the installation of electrical conduit and the backfill work within 1 foot around this conduit to Gustav Hirsch Organization, Inc. (GHO);
(2) the installation of mechanical pipes and the backfill and compaction around them to Natkin and Company; and
(3) the installation of certain hardened cable to American Bridge Division United States Steel Corporation.

12 feet with heavy equipment such as scrapers, resulting in a dish bowl-shaped excavation, but the following 20 feet of excavation could only be done by use of a backhoe. Below the -32 foot level another subcontractor was to drill a circular hole some 20 feet in diameter extending an additional 50 feet underground. The excavation sloped gradually down to the -12 foot level, but from there to the -32 foot level the excavation resembled a deep inverted cone. The diameter of the excavated area at the -32 foot level was approximately 40 feet, leaving only a three-foot wide shelf between the slopes of the excavation and the equipment room when the silo and equipment room had been completed. Due to the close quarters, much of the compaction of the backfill from the -32 foot level to the -20 foot level had to be done by hand tamping. As the cone widened above the -20 foot level, the area of operations between the side of the equipment room and the earth bank was sufficient to permit the use of other compaction equipment. Above the -12 foot level the area widened extensively which made possible the efficient usage of large tractors and rollers.

The excavation, the temporary construction of fencing, roads and ditches, and the production and stockpiling of sand, gravel and earth for backfill progressed without significant incident until April 1, 1962. During the next ten days it became readily apparent that Summit and Kiewit were at odds in their interpretations of the backfill procedure defined in paragraph 7 of the additional provisions to their contract.[8] Summit contends that the provision reflected its intention to have nothing to do with back-filling with pipe in the excavation, that the one foot above the pipe phrase meant Summit was to backfill to approximately ground level without any interference from either the electrical, mechanical or structural subcontractors. It is Summit's position that after completion of this initial backfill stage the other subcontractors were then to re-excavate, install the necessary pipe and conduit, and backfill to the former level, from which Summit would complete the backfill operation to the finished construction ground surface.

Summit's complaint asserts Kiewit committed a substantial breach of special provision 7 by requiring Summit to work concurrently with the electrical, mechanical and structural contractors and to phase its backfill operation. Summit also alleges Kiewit was guilty of tortious conduct in that Kiewit hindered Summit's performance of the contract by requiring Summit to perform work with relation to backfill in a manner entirely foreign to that contracted for and of such complexity as to destroy the contract, by changing schedule and completion dates relating to backfill so often and by interrupting Summit's work to the point that it was impossible to restore the operation to a condition of normalcy, and by demanding and inducing Summit to embark upon a scope of work of such magnitude beyond the contract that Summit was unable to perform either its contract or the extra work demanded of it.

Kiewit counters by arguing that Summit's interpretation of special provision 7 would reach an absurd result because it would require the electrical, mechanical and structural subcontractors to re-

8. Section 2 of the Kiewit-Summit Subcontract apparently incorporates pertinent sections of the Kiewit-United States Government contract. Since the Subcontract, except for special provision 7, defers explanation of the backfill plan to the government prime contract, certain of the prime contract's provisions are of import here:

"3-08. Filling and Backfilling * * * The Contractor shall submit a complete filling and backfilling plan for approval, well in advance of the start of fill and backfill operations. This plan shall detail the sequence and timing of the proposed backfill operation and the equipment to be used. All fill and backfill shall be shaped to drain. The plan shall be approved in writing prior to any filling or backfilling."

excavate 28 of the 32 feet of backfill which Summit had just completed. Kiewit also maintains Summit's interpretation is inconsistent with its actions and conduct during the time when it worked on the project. Subsequently Kiewit counterclaimed (as amended) for $2,185,401 against Summit for the cost of completing Summit's work under the contract due to Summit's allegedly unjustified abandonment of the contract.

The trial court found special provision 7 of the Subcontract was ambiguous, thus leaving the proper interpretation of that provision for the jury's determination.

Since Kiewit has challenged the sufficiency of the evidence to sustain the verdict based on a breach of the Subcontract,[9] we review the pertinent evidence concerning the Subcontract, including the interpretation that the parties placed upon the clause in their dealings and by their conduct.[10]

## I. BREACH OF CONTRACT— SUFFICIENCY OF THE EVIDENCE

In both October and December 1961 Kiewit informed Summit of proposed changes in Kiewit's contract with the government. Each change involved relocation of pipe in the backfill area, with the first change order affecting only the control centers and the second affecting only the missile sites. Summit, because it felt its backfill work was to be done prior to the positioning of any pipe in the hole, replied in each case that the proposed change did not affect its contract. When Kiewit informed Summit these changes would mean delay, Summit did make submittals. In its October 16 submittal Summit also agreed to backfilling 2 pipes at each of the 15 control centers for $13,625.

On November 27, 1961, Kiewit sent Summit a critical path progress schedule which indicated that the first backfill phase to 992[11] and the various piping was to be done within a four-day period. Summit's Secretary-Treasurer Emme felt this plan was substantially consistent with Summit's understanding of the backfill procedure since he felt Summit could complete its backfill stage in two days, leaving the other subcontractors two days to re-excavate, do their piping, and re-backfill. Kiewit argues that Summit's failure to protest this plan, which seems to call for a concurrent work effort on the part of Summit and the other subs, was inconsistent with Summit's interpretation of the contract.

On February 14, 1962 Summit submitted a backfill plan to Kiewit containing the following language:

"Where the penetrations take place in this area we will work in conjunction with the affiliated contractors and will backfill one foot above the elevation of the lines, and we will then compact on

9. The case was submitted to the jury on special interrogatories. The jury found for Summit and based liability solely on a breach of contract by Kiewit, expressly rejecting Summit's allegation of tortious conduct by Kiewit. This special verdict for Summit necessarily disposed of Kiewit's counterclaim. Although Summit has cross-appealed upon the refusal of the trial court to submit certain items of liability and damage to the jury (*see* text accompanying footnote 4, *supra*), Summit has not appealed the jury's adverse finding on its tort claim.

10. It is noted General Insurance Company feels that the clause is more than ambiguous because there was not in fact a meeting of the minds necessary to form a contract.

11. It is worthy of note that there was a discrepancy in the measuring base of the two parties (or at least in the briefs on the part of their attorneys). Summit used the finished construction ground surface as its base or 1000 while Kiewit used assumed ground level as its base or 1000. Therefore, Summit considered 992 to mean 4 feet below natural ground level. Still, even from Summit's method of measuring, this would mean stopping the first phase 4 feet lower than it had originally planned. Summit testified it acquiesced in this change because as long as no pipes were installed above that level prior to the second backfill phase it would have no substantial effect on Summit's work or costs.

the opposite side of the equipment room while the excavation for these lines are made and the piping placed and the backfill material placed. This will take very close coordination with the mechanical and electrical contractors and other associates involved which we hope to have with them."

Kiewit views this plan as inconsistent with Summit's interpretation because it would not be necessary for Summit to work in close coordination with the other subcontractors if Summit were entitled to backfill from bottom to top without interference. Summit says this language only reflects an agreement between Summit and the various subs that Summit would backfill in other areas of the site while the subs put in their stub-ins, with the understanding the agreement would terminate should the procedure result in delays to Summit. On April 2, 1962,[12] Kiewit submitted its backfill plan to the Corps of Engineers stating "backfill will be placed approximately one foot above 'pipe and conduit' locations with a temporary suspension in specific areas such that ditching, pipe or conduit placement and refill may be accomplished." Summit was neither shown the Kiewit plan nor informed of the changes made by Kiewit.

In February or March, Summit subcontracted its backfill responsibilities to Plant-Dartnell Inc. for $574,000. The contract with Plant-Dartnell also contained a provision identical with special provision 7 of the Kiewit-Summit contract. On April 4, Kiewit wrote Summit it should instruct its subcontractor as to the special care required to protect installations in the backfill and the need for close cooperation with the other subs who would be working concurrently with the backfill operations. On April 5, Kiewit wrote to Summit and outlined a backfill procedure consisting of six phases, but the letter noted this suggested procedure was only to be a guide.

Summit and Kiewit held a meeting on April 11, at which Kiewit instructed Summit to disregard the "6-phase" letter of April 5. Kiewit then asked Summit to prepare a three-phase two-stop backfill plan, which brought a protest from Summit that this would be outside its contract. After Kiewit agreed the plan would only be for a trial site, Plant-Dartnell prepared the requested plan and Summit submitted it to Kiewit on April 17. On the 19th Summit and Kiewit conferred on the three-phase plan with Summit again reiterating that the contract contemplated only one stop.

Meanwhile Summit had begun to backfill at site B-5, but was directed by Kiewit to move to another site. Upon Summit's return to site B-5 on April 25, Summit found all the pipe installed above the level of the existing backfill at -20 feet. When Summit protested the presence of the pipe, Kiewit initially directed Summit to another site but subsequently ordered Summit back to site B-5 to complete backfill to the second level and above the pipe by April 30.

Kiewit called a meeting of the other subs involved in the backfill area on April 28 and informed them the three-phase two-stop plan would be the official procedure. Although Summit protested this change would require corresponding remuneration for Summit, Kiewit replied that the matter of remuneration and designation of field responsibility was for the various subs to work out among themselves. From April 28 on Summit found pipe in the excavation when it began the second and third phases of the backfill operations.

Prior to the start of backfill operations and throughout backfill work on the first sites, Summit, Plant-Dartnell and the other subs involved had held several meetings in an effort to determine each contractor's backfill responsibilities.[13]

---

12. All references to dates hereafter refer to the year 1962 unless otherwise indicated.

13. Plant-Dartnell did reach a minor agreement with Natkin, the mechanical contractor, in which Plant agreed to perform the backfill around some of Natkin's conduit for $20 a site. However, this arrangement was but temporary and was dis-

These negotiations were hampered from the outset not only because Kiewit failed to set forth a coordinated backfill plan in any of the subcontracts but also because these subcontracts did not delineate the extent of each sub's contract price as payment for its backfill work.[14] Without some division of backfill responsibility, it was literally impossible for Summit to judge whether the changes legitimately fell within section 4 of its Subcontract,[15] which gave Kiewit the right to assign additional work to Summit for additional compensation, or constituted a change of scope going to the root of the contract. Indeed, there was no way to ascertain from the various subcontracts whether Kiewit had even fully assigned all backfill responsibility. Yet Kiewit kept the pressure on Summit by asserting that the backfill was Summit's responsibility and if Summit did not reach agreements with the other subs, Kiewit would assign all backfill duties to Summit.

Kiewit's pressure tactics also were felt by Summit in the field. On April 30 Kiewit instructed Summit to put on a double shift in an effort to keep up with the original time schedule. At a May 10 meeting Kiewit insisted and Summit agreed to devote even more men to the job in order that the backfill might be returned to schedule. On May 11 came the first of several Kiewit orders directing Summit to backfill the other subs' pipe. When Summit was unable to keep up due to the extra work and to several delays in the work of the other subs, Kiewit wired Summit on May 16 threatening to place Summit in default if the required progress rate was not maintained. Summit replied by wire on May 18th that the work imposed was beyond its contract and since no pay was forthcoming it was ceasing work. A flurry of meetings in the next few days culminated

in Kiewit's May 23 assignment of the pipe backfill work of GHO, Natkin, and American Bridge to Summit under section 4 of the Subcontract. While agreements between Summit and GHO and Natkin were drawn but never executed, Summit had indicated to Kiewit on May 21 that these agreements had been finalized. On May 24 Summit took over Plant-Dartnell's subcontract.

In attempting to calculate the cost of doing the work in the manner required by Kiewit, Summit retained Gigear Engineering and an outside engineer, Roy Ladd. In early May, Plant-Dartnell had conducted a test run at one of the sites to determine the rate of production with pipe in the hole and without pipe in the hole and had concluded the backfill rate unhindered by pipe in the hole was three and one-half times the rate when pipe was in the hole. On May 23 Ladd estimated the additional cost of doing the backfill as required by Kiewit at $529,530 but warned that this figure contained very little margin of error.

On June 2 Kiewit asked Summit to submit its prices for the work assigned on May 23 and stated if such prices were not submitted by June 6 Kiewit would consider the claims withdrawn. On the 6th Summit replied it was unable to submit its prices at that time and requested additional time.

Backfill operations were still running behind schedule, partly due to delays in the pipe installations by the other subs but largely due to Kiewit's insistence that Summit maintain the original progress schedule, which Summit agreed to with the understanding it was to backfill without pipe in the hole. On June 5 Kiewit ordered Summit to add an extra crew to do backfill while pipe was being laid and on the 8th Kiewit ordered Summit to work Sundays. Finally, on June

carded within a few days as unsatisfactory.

14. During their contract negotiations, Kiewit's proposal and Summit's estimate allotted $600,000 for the backfill work that Summit proposed to do.

15. The pertinent part of section 4 of the Subcontract reads: "The contractor may * * * make changes in, additions to and omissions from the work to be performed and material furnished under this Subcontract * * *."

Kiewit ordered Summit to run two 10-hour crews seven days a week.

On June 21 Summit wrote Kiewit a letter which set out its increased costs due to the contract changes at $1,400,-771. Kiewit's reply the next day asked for complete backup material to substantiate the alleged change of scope on the ground that Summit had earlier given assurance it had reached agreements with the other subs concerning compensation for the assigned work. Summit's wire on the 23d that its continued work would assume Kiewit's willingness to pay brought a barrage of three Kiewit telegrams that night containing an express negation of this assumption and a demand for a complete statement of the change of scope, compliance with the previous schedule, and the immediate implementation of two 10-hour shifts. In answer to Kiewit's request, Summit on June 26 summarized its claimed change of scope as follows:

"1. Interupting [sic] the backfill operation at arbitrary lines and grades for the convenience of any or all contractors or subcontractors except the backfill operation.

"2. Installation of pipe, conduit, concrete, etc. before completion of the backfill operation.

"3. Backfill around the pipe, conduit, concrete, etc.

"4. Interference to all backfill operation of all items placed in and over the fill area, before proper completion of the backfill."

At the Kiewit-Summit conference held June 29, Kiewit offered $143,000 as total compensation for the work involved by the change in scope and the increased complexity of the backfill operation. No agreement was reached at this conference and on June 30 Summit wired Kiewit it was stopping work due to Kiewit's failure to pay for the extra work relating to backfill already done and due to Kiewit's refusal to offer adequate payment for future work.

Kiewit's letter of July 2 terminated the contract due to Summit's alleged default but requested Summit to continue work "for the account" of Kiewit until Kiewit could take over the work. Summit cooperated by working 20 hours a day, seven days a week from July 2 to the 14th under this force account agreement. On July 3 a tentative agreement was initialed by Kiewit and Summit whereby Kiewit agreed to pay Summit an additional $450,000 for the backfill work it assigned Summit on May 23. Formal signing of the agreement was to be deferred until Summit could obtain the consent of its surety, but on July 10 Summit wrote Kiewit the proposed compensation was unsatisfactory and it would need an additional $1,400,-000 in order to continue. On July 12 Kiewit wrote to Summit reinstating its termination of the contract, which had been orally suspended contingent upon execution of the July 3 agreement. Kiewit did pay the labor payroll for the force account period, but did not pay Summit's equipment rental claim of $115,666 for that period.

The trial court correctly ruled that special provision 7 of the Kiewit-Summit Subcontract was ambiguous and properly submitted the issue of interpretation of that provision to the jury. Having in mind the jury's determination and the principle that upon appeal we view the evidence in a light most favorable to the verdict, we find the evidence, including the conflicting evidence, sufficient to warrant the verdict and now examine Kiewit's specific contentions on the contract.

## A. THE CHANGE OF SCOPE

Kiewit contends that any additional work required of Summit was covered by section 4 of the Kiewit-Summit Subcontract which authorized Kiewit to make additions to Summit's work for commensurate compensation. A similar contention was raised in Saddler v. United States, 287 F.2d 411, 152 Ct.Cl. 557 (1961) with regard to a provision in a contract to provide materials and labor for the construction of a levee embankment which permitted the contracting

officer to make changes in the contract specifications provided they were within the general scope of the contract.[16] The government contracting officer made a change order requiring 7950 cubic yards of enbankment at the same unit price as in the original agreement for 5500 cubic yards. A second change order was issued requiring 13,264 cubic yards. The length of the levee and the total cubic yardage contained in its design were doubled (over the original plan) by the second change order and while riprap work accounted for approximately 60 per cent of the estimated total price under the original contract, it accounted for only 40 per cent of the total after the second change order. The Court of Claims held that the "changes" article of the contract permitted only those changes in contract specifications that were within the general scope of the contract for which an equitable adjustment was to be made in the contract price. The Court said the number of changes alone is not determinative of whether alterations are outside the scope of the contract and rationalized that the point at which a change becomes too substantial is really a matter of degree. In *Saddler* a breach was found because the substantial change resulted in more than doubling the amount of earth to be placed, in extending the contract period significantly, and in requiring the contractor to return equipment, which the contractor no longer thought was needed, to the jobsite a hundred miles away.

█ In the instant case there is clearly sufficient evidence to find that the changes ordered by Kiewit went so beyond the scope of the Subcontract, including the "changes" provisions of section 4, as to breach the Subcontract. Instead of permitting Summit to backfill in a two-phase operation unimpeded by pipe in the hole as agreed in special provision 7, Kiewit required backfilling

to be done in three phases *after* pipe had been laid and thereby increased immeasurably the difficulty of the backfill operation. The original estimated cost of $600,000 was increased over threefold to approximately $2,000,000 by this change in the method of backfill. The change of scope is plainly manifested in the 300 per cent increase in backfill costs and is likewise reflected in a well over 50 per cent increase in the cost of performing the overall Subcontract. *Saddler* stands as precedent that changes of scope of much less magnitude than this have been found to be substantial breaches of contract. See also Oberer Construction Co. v. Park Plaza, Inc., 18 Ohio O.2d 198, 179 N.E.2d 168 (Ct. C.P., Montgomery Co. 1961) (where a change requiring the removal of 35–40,000 more cubic yards of excavation than the original 190,000 cubic yards was found to be a substantial breach).

█ Kiewit also maintains Summit's method of proving that there was a substantial change in the scope of the Subcontract by proving the difference between the actual cost of backfill performed to June 30 and Summit's original bid estimate is generally not acceptable because this computation assumes that the original contract price or cost estimate was reasonable. The cases which Kiewit cites for this proposition are not apposite because they reject this formula only as to proving damages—not as a method of proving liability for breach of contract due to a substantial change of scope. See F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 399–400, 131 Ct.Cl. 501 (1955). Furthermore, the Court of Claims in *Saddler* at least gave tacit approval of proving change of scope of a contract by showing the difference between the final contract price over the original contract price.

█ Kiewit further contends that Summit's failure to allocate the backfill

16. We construe section 4 of the Subcontract as only authorizing changes or additions that are within the general scope of the contract. This limitation must be

implied as a matter of law. Kern v. Granquist, 185 F.Supp. 769, 772 (D.C. Or.1960) ; 17A C.J.S. Contracts § 373 (1963).

costs as to weather conditions, extra work, and so forth causes the lump sum figure given as backfill cost to lack probative value in showing the alleged change of scope. Kiewit bolsters this charge by pointing to section 6 of the Subcontract which expressly states that Summit will not be compensated for any delays it suffers due to acts of Kiewit or the other subs and to the evidence that 314 crew shifts, or 41 per cent of the number possible from the start of backfill operations to June 30, were lost due to rain and other factors not attributable to Kiewit. Lichter v. Mellon-Stuart Co., 305 F.2d 216 (3d Cir. 1962), urged as support for Kiewit's position, is distinguishable on its facts. *Lichter* does state a contract may validly provide that a contractor shall be entitled to no relief except an extension of the time of performance if circumstances beyond his control delay his work, even though such delay does in fact increase his costs, but *Lichter* is not concerned with an increase in a subcontractor's costs caused primarily by a change in scope of the contract. It is patent that the disclaimer provisions of section 6 of the Kiewit-Summit Subcontract are not applicable when Summit's increased costs are the result of a substantial change of scope of the Subcontract. The question raised as to the correctness of Summit's allocation of its backfill costs was an evidentiary matter that was properly submitted to and considered by the jury.

█ Also, in connection with proving the extent of increased costs in the liability phase of the trial, Kiewit objected to the admission of Exhibit 154 (which summarized Summit's actual backfill costs) on the ground it did not comply with two requirements of the Uniform Composite Reports as Evidence Act.[17] First, the exhibit is objected to on the ground that Frank Short, who prepared it, was Summit's regular accountant, and consequently could not possess the objectivity contemplated by the statute's requirement that the preparer of the report not be an employee of the offering party. This objection can be dismissed on its face as Short was an independent accountant employed for the purpose of making this report and thus comes under the exception set forth in the statute. Secondly, though the exhibit was presented to Kiewit at the pretrial conference immediately preceding the trial, Kiewit objects that there was no specification or identification of the exhibits or records upon which the composite report was based nor was there any identification of the witnesses who had oral communications with the preparer of the report. While Summit did make available all its records concerning the entire project, Kiewit asserts the statute requires more than a "lumping" of exhibits, which procedure imposes upon the party against whom the composite exhibit is offered the burden of determining what records form the basis of the report.

█ There are no South Dakota cases interpreting this part of the statute (§ 19–6–16 in the revised annotated volumes). Nebraska and Ohio are the only two jurisdictions in addition to South Dakota that have adopted the Uniform

17. The pertinent provisions of S.D.C.1960 Supp. § 36.1002 (now S.D.C.L.1967 Ann. § 19–6–14) are:

"Admissibility of expert report or finding based on information furnished by others.—A written report or finding of facts prepared by an expert not being a party to the cause, nor an employee of a party, except for the purpose of making such report or finding, nor financially interested in the result of the controversy, and containing the conclusions resulting wholly or partly from written information furnished by the co-operation of several persons acting for a common purpose, shall, in so far as the same may be relevant, be admissible when testified to by the person, or one of the persons, making such report or finding without calling as witnesses the persons furnishing the information, and without producing the books or other writings on which the report or finding is based, if in the opinion of the court, no substantial injustice will be done the opposite party."

Act. In Trute v. Skeede, 162 Neb. 266, 75 N.W.2d 672, 682–83 (1956), the Supreme Court of Nebraska construed the provision in question as permitting the trial judge to admit the evidence even though no copy of the report was given to the adverse party before trial if the trial judge finds that no injustice would result from the failure to give such notice. In the instant case where the composite report was given to Kiewit at a pretrial conference and where Kiewit had access to Summit's records throughout the trial, it cannot be said to be an abuse of the trial court's discretion to admit the composite report without requiring Summit to specify the records from which the composite report was compiled.

Also, from the record it is clear the trial court was aware of the statutory requirements for admission under the Uniform Composite Reports as Evidence Act and held that a proper foundation had been laid for the admission of Exhibit 154 in the liability phase of the case.

### B. PREVENTION OF PERFORMANCE

██ It is hornbook law that an implied provision of every contract is that neither party to the contract will do anything to prevent performance thereof by the other party or commit any act that will hinder or delay performance. Northeast Clackamas C.E. Co-op. v. Continental Cas. Co., 221 F.2d 329, 334 (9th Cir. 1955); George A. Fuller Co. v. United States, 69 F.Supp. 409, 411–12, 108 Ct. Cl. 70 (1947); Restatement of Contracts, § 315(1) (1932). By installing pipe in the holes prior to the backfill operations, Kiewit so hindered Summit's performance of the Subcontract as to amount to a substantial breach of that Subcontract.

### C. REPUDIATION BY BAD FAITH OFFER TO COMPENSATE

██ Assuming Kiewit's assignment of the backfill obligations of GHO, Natkin, and American Bridge to Summit on May 23 was within its contractual rights under section 4 of the Subcontract (which legal conclusion we do not think valid for reasons previously discussed), Kiewit's meager offer of $143,000 on June 29 as compensation for all the extra backfill work is so lacking in good faith as to constitute a repudiation of the Subcontract. As stated in W. J. Walker v. Shasta Minerals & Chemical Co., 352 F.2d 634, 638 (10th Cir. 1965), an offer to perform made in accordance with the promisor's interpretation of the contract, even though erroneous, is not such a clear refusal to perform as to constitute an anticipatory breach if that offer was made in good faith. Kiewit's lack of good faith is evident from its $143,000 offer, which was but 10 per cent of Summit's estimate (the accuracy of which was subsequently borne out by Kiewit's counterclaim for $2,185,401, its cost of completing the Subcontract), and its June 29 comment to Summit that the latter could do better with the other subs than it could with Kiewit in arranging some backfill settlement.

Kiewit further contends that even assuming arguendo its $143,000 offer constituted a repudiation of the Subcontract, the repudiation was nullified because this offer was revoked by the parties' resumed negotiations and their initialed agreement of July 3 before Summit had materially changed its position or brought suit for damages. Although we acknowledge the sound precedent of Quivirian Development Co. v. Poteet, 268 F.2d 433, 439 (8th Cir. 1959) supporting this contention, we also note there is evidence that Summit had pulled its crews off the job and had commenced removal of its equipment as of June 30. Furthermore, *Quivirian* is concerned only with an anticipatory breach, while here we are dealing with an actual breach. Nevertheless, it is not necessary for us to resolve this issue inasmuch as the jury's verdict assessing a breach against Kiewit was warranted by the evidence on any of the several grounds discussed above and the jury's factual determination is controlling.

## D. ELECTION OR WAIVER

Kiewit contends that Summit elected not to treat the May 23 assignment as a substantial breach of contract because Summit did not protest the assignment, but instead continued backfill work for another month and accepted two progress payments after May 23.

Kiewit cites Pasquel v. Owen, 186 F. 2d 263, 271 (8th Cir. 1950), which quotes section 688 of Williston on Contracts with approval, for the following principle:

> " * * * [W]herever a contract not already fully performed on either side is continued in spite of a known excuse, the defense therefore is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to."

In *Pasquel*, Mickey Owen signed a contract to manage and play baseball in Mexico. After about five weeks of managing he was relieved of his position, but he continued on as a player without protest and continued to receive compensation for a month, at which time he abruptly left Mexico and returned to the United States. The owner of the Mexican team sued Owen for breach of contract. Owen argued that the owner had committed a substantial breach of contract by relieving Owen from his managerial position, thus excusing Owen from any obligation for further performance. The Eighth Circuit ruled under Missouri law that Owen elected to continue under the contract by playing ball for a month after the alleged breach and by accepting compensation under the contract.

 Kiewit correctly points out the crux of the doctrine of election is that the law will not permit a party to exercise two alternative or inconsistent rights or remedies, therefore, an election can be made even though there was no apparent intention to surrender a right.[18] 5 S. Williston, Contracts § 684 (3d ed. 1961). However, the Court of Appeals in *Pasquel* carefully limited the doctrine of election

---

18. Kiewit contends that the trial court erred in giving incorrect and contradictory instructions on the issue of election. The pertinent parts of the instructions in question are:

Instruction 14: "To constitute a waiver there must be an intentional forbearance by Summit to enforce a right, after all effort to adjust differences has been abandoned or has proven hopeless."

Instruction 45–a: "You are instructed that 'waiver', as used in these instructions, means the intentional foregoing by a party of a known right or defense, or an affirmative act on the part of a party which the party claiming waiver reasonably relied upon as an expression that the party against whom waiver was claimed intended to forego such right or defense."

Instruction 13: "You are instructed that whenever a contract not already fully performed on either side is continued, in spite of a known breach by the other party, the alleged breach is waived, and the party has no right to abandon the performance of the contract by reason of such alleged breach, unless the right to retain such breach as an excuse for not performing is not only claimed by the one party, but agreed to by the other party."

Since an election can occur without the intentional relinquishment of the right to bring suit on the breach (if the innocent party continues to perform under the contract), Instructions 14 and 45–a are inaccurate to the extent that they do not reflect an election can be made through such inconsistent conduct alone. However, Instruction 13's explanation of "waiver" is sufficiently broad to encompass this aspect of the doctrine of election. That these instructions are inconsistent and somewhat contradictory does not constitute reversible error under South Dakota law. The governing principle was set forth in Dwyer v. Christensen, 77 S.D. 381, 92 N.W.2d 199 (1958), and reaffirmed as recently as February 25, 1969, in Northwestern Bell Tel. Co. v. Henry Carlson Co., 165 N.W.2d 346, 351 (S.D.1969):

"Instructions to the jury must be considered as a whole and when as a whole it [sic] gives a full and correct statement of the law applicable to the case, they are not erroneous because the particular instructions taken alone may not have embodied all the law applicable." Dwyer v. Christensen, 92 N.W. 2d at 204.

to those instances in which a party continues performance "in spite of a known excuse." In the instant case there was no way in which Summit could ascertain the extent of the change of scope except by experience. Therefore, it was impossible for Summit to determine on April 25 whether backfilling with pipe in the hole in a three-phase operation was legitimately within section 4 of the Subcontract or whether it constituted such a substantial change of scope as to breach the Subcontract. The three-phase operation started first as an experiment, then was assigned to Summit on May 23 with both an express and implied promise of additional compensation. The magnitude of the change of scope became more and more apparent with the passage of time. Summit was still protesting but trying to cooperate. It seems clear that since Summit cannot be held to have had either actual or constructive notice of its excuse until June 30 when it became apparent reasonable compensation for the additional work was not forthcoming from Kiewit, Summit cannot be deemed to have elected to continue under the Subcontract. *See* Saddler v. United States, 287 F.2d at 414.

Johnson v. De Waard, 113 Cal.App. 417, 298 P. 92 (1931), makes clear that one will not be penalized by the doctrine of election for making good faith efforts to resolve contractual differences, and this rationale is particularly persuasive in the instant case since Summit was bound by the open-ended nature of section 4 of the Subcontract to perform additional work assigned to it by Kiewit. In the *De Waard* case the prime contractor on a storm drain project subcontracted the excavation of the tunnel to the plaintiff. While the plaintiff's work was in progress, the prime contractor constructed concrete walls in one end of the tunnel without the plaintiff's consent, forcing the plaintiff to suspend work in the upper part of the tunnel and to carry the excavated material much further than would otherwise have been necessary. When the prime contractor subsequently refused to pay plaintiff as

agreed, plaintiff ceased work. The First District Court of Appeal of California held that the plaintiff was entitled to do its work without the prime's interference and that the plaintiff did not waive its right to sue for breach of contract by continuing work for several weeks after the prime started construction in the tunnel. The court found the plaintiff did not intend to waive its rights and no inference of relinquishment could be made since efforts were being made to adjust the contractual differences and only when these efforts appeared hopeless did the plaintiff cease work.

Summit protested from the very beginning when Kiewit hinted that it was thinking in terms of a three-phase backfill operation rather than the two-phase operation initially conceived. It was because Summit protested that it would need more money if a three-phase operation were to be used that Kiewit referred to the first site backfilled in three phases as a trial site. Summit vehemently protested Kiewit's placement of pipe in the hole ahead of its backfill operations beginning on April 25. When Summit demanded more money Kiewit tried to avoid its responsibility by informing Summit the matter of additional compensation was for Summit to work out with GHO, Natkin, and American Bridge, the other subs with backfill duties. Summit did negotiate with these three subs to no avail and finally Summit accepted Kiewit's assignment of all backfill responsibility on May 23, with the understanding that reasonable compensation would be paid for this extra work. By the time of the assignment it had become readily apparent that backfilling in three phases with pipe in the hole was substantially increasing the scope of Summit's work obligation. Yet Summit continued to work in good faith while at the same time it sought to reach an equitable settlement with Kiewit for this extra backfill work. Only when it became apparent from Kiewit's paltry offer of $143,000 on June 30 that Kiewit did not intend to negotiate in good faith did Summit stop work. It was Kiewit, not Summit, who

drew the open-ended section 4 of the Subcontract and it was Kiewit who invoked section 4 by first requiring Summit to backfill in three phases with pipe in the hole and by subsequently assigning Summit the backfill duties of the other three subs on May 23. Consequently, Summit cannot be held to have elected to continue under the Subcontract by working until June 30 when it is realized that had Summit refused to do the additional work imposed by Kiewit, Summit would have subjected itself to the very real possibility of a potential breach of section 4. In conclusion, the allegation that Summit elected to proceed under the changed Subcontract does not appear to be substantiated by the evidence, and in any event this issue was properly submitted to the jury for its determination.

## II. SUBMISSION OF ISSUE OF TORTIOUS CONDUCT

▮ Kiewit claims it was prejudiced by the submission of the tortious conduct and duress charge contained in Summit's complaint. There is sufficient evidence in the record to warrant the submission of Summit's tort claim to the jury. Summit as an operating entity was impaired by Kiewit's breach of the contract and by Kiewit's demand for additional work under the contract for which it failed to properly compensate Summit. The submission of the tortious conduct and duress issue was not error. However, since the jury verdict in favor of Kiewit on this point was not appealed by Summit, no further consideration of this issue is necessary.

## III. DAMAGES—COMPUTATION AND AMOUNT

▮ The prime contract with Kiewit, being a contract with the Government,

is governed by federal law. Sam Macri & Sons v. United States. 313 F.2d 119, 124 n.1 (9th Cir. 1963); Ivanhoe Irrig. Dist. v. McCracken, 357 U.S. 275, 289, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958). However, a subcontract between private parties, as is the case here, is governed by state law. Sam Macri & Sons v. United States, 313 F.2d 119 (9th Cir. 1963); Continental Casualty Co. v. Schaefer, 173 F.2d 5, 7–8 (9th Cir. 1949), cert. denied 337 U.S. 940, 69 S.Ct. 1517, 93 L.Ed. 1745 (1949).

▮ Kiewit contends that since the Subcontract involved a government project, the damages test set out in United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168 (1884)—expenditures (less the value of material on hand) plus the profits that would be realized by performance of the whole contract, if they are capable of proof—should have been applied. But, Burstein v. United States, 232 F.2d 19 (8th Cir. 1956) relied on by Kiewit for this contention, involved a direct suit against the Government on a prime contract as did *Behan*. The rule that contractual disputes between private parties on a subcontract pursuant to a government project are governed by state law has been followed by the Eighth Circuit. Frank Sullivan Company v. Midwest Sheet Metal Works, 335 F.2d 33 (8th Cir. 1964); Blair v. United States, 147 F.2d 840, 849 (8th Cir. 1945). The trial court properly applied the law of South Dakota on the damages for breach of contract.[19]

▮ Kiewit and Summit both agree that the cost of completion must be estimated as nearly as possible according to the circumstances as they exist at the time of the breach.[20] J. D. Hedin Construction Co. v. F. S. Bowen Electric Co.,

19. Where a party has been wrongfully prevented from fully performing a contract, he has the choice of two remedies under South Dakota law:
 " * * * He may treat the contract as terminated, and recover the value of his services performed and money necessarily expended under the contract; or he may bring his action for a breach of the contract, and recover

all he would have been entitled to by its terms, less the expense attending the complete fulfillment of the same." Davis v. Tubbs, 7 S.D. 488, 64 N.W. 534, 535–36 (1895).

20. Summit stipulated that the breach of contract occurred on June 29, 1962 for the purpose of calculating damages.

106 U.S.App.D.C. 386, 273 F.2d 511, 513 (1960). However, Kiewit contends that the trial court improperly applied this rule to the instant case.

Kiewit also argues that the estimate of Summit's President Rounds alone is inadequate to establish Summit's cost of completion, citing Autrey v. Williams and Dunlap, 343 F.2d 730, 742 (5th Cir. 1965). The very terse discussion of this point in *Autrey*—no mention is made of the experience of the contractor making the estimate or the novelty or lack thereof in this type of construction—is based entirely on Louisiana law, which provides us with little precedent in the instant case. The case of Haddad v. Western Contracting Co., 76 F.Supp. 987 (N.D. W.Va.1948), which was also cited by Kiewit for this proposition, did reject the plaintiff-contractor's estimate of lost profits but not on the ground that such estimates are not acceptable. *Haddad* recognized the right to lost profits and that only reasonable certainty is required in the estimation but refused to award damages of lost profits because the plaintiff-contractor did not state the amounts and the estimated cost of labor and materials at current market prices needed to complete the job.

The South Dakota Supreme Court has articulated a "reasonable certainty" test concerning the proof needed to establish a right to recover damages:

"While the nature of the case may not permit estimating damages with certainty, it is the rule in this state that the matter of measuring damages may not be left to mere speculation on the part of the jury. Facts must exist and be shown by the evidence which afford a basis for measuring the loss of the plaintiff with reasonable certainty." Kressly v. Theberge, 79 S.D. 386, 112 N.W.2d 232, 233 (1961).

In Frank Sullivan Company v. Midwest Sheet Metal Works, 335 F.2d 33 (8th Cir. 1964) the Eighth Circuit applied Minnesota law and sustained a verdict awarding damages on the basis of an estimate of cost of completion by the plaintiff-contractor's employee Elnicky. The following from the Court's discussion would seem dispositive of this point:

"Elnicky's concession on cross-examination that when he figured a job 'We do not know how much is going to be overhead or how much is going to be profit * * * *' and that labor costs on a job are 'guesstimates', do not strike us as concessions of a lack of *reasonable certainty*. The contracting business is hazardous and small errors or unforeseen developments can be costly. See Southern Fireproofing Co. v. R. F. Ball Constr. Co., 334 F.2d 122 (8 Cir. 1964). But this does not disqualify a competent and experienced contractor's best estimate, reasonably compiled, as acceptable evidence. To hold otherwise would tend to bar recovery in all construction cases." *Id.* at 41–42 (emphasis added).

Kiewit's attempted distinction of *Sullivan* on the ground that no partial performance of any kind had been rendered at the time of breach and therefore the contractor's estimate was the only means available to the plaintiff to prove damages is not persuasive. We think only reasonable certainty, not absolute certainty, is required in estimating damages and that doubts are generally resolved against the party committing the breach. This is particularly true in situations such as this where precise proof of the amount of damages is difficult if not impossible. Air Line Pilots Assoc., Int'l v. Northwest Airlines, Inc., 415 F.2d 493 (8th Cir. 1969).

Kiewit also contends that Rounds' estimate of the cost of completion was speculative and unreliable for the following reasons:

1. It was premised solely on the validity of the original estimate without regard to actual costs incurred to date of abandonment;

2. The equipment costs which Rounds used in estimating cost of completion were considerably less than the equipment charges Summit demanded from Kiewit for Summit's force account work;

3. It failed to include the cost of performing Change Order No. 2;

4. Rounds' estimate of the cost of completion was made on the premise that the quantities stated in Kiewit's original invitation for bids were accurate. It failed to take into account actual quantities needed as of June 30 to finish the job and erroneously assumed that the 310,000 cubic yards of select material contained in the invitation for bids called for "loose" yards and not "in-place" yards;

5. In determining the cost of completion of the backfill portion of the Subcontract, Rounds utilized the Summit-Plant-Dartnell subcontract price even though this subcontract had been abandoned in early June and Kiewit's approval of Plant had been withdrawn on May 24. Under the circumstances, use of this subcontract as the basis for estimating cost of completion of the backfill was speculative and without probative value;

6. The complexity and novelty of this missile project coupled with Summit's inexperience with a construction project of this character made any estimate of profits speculative and conjectural.

This Court recognizes that a new estimate of the cost of completion will generally be more reliable than the contractor's optimistic initial estimate "since as the work progresses difficulties and risks are encountered and the efficiency of the builder is tested, by reason whereof the possible error in estimating the cost of completing the remainder is reduced." E. Patterson, Builder's Measure of Recovery for Breach of Contract, 31 Colum.L.Rev. 1286, 1293 (1931). Under cross-examination Rounds stated that he did take into account the costs of installing culvert in the spring of 1962, but he did not use actual cost figures in estimating future labor and gravel costs because past experience on the job was so disrupted by the breach of the Subcontract and so interrupted by moving men from gravel operations to backfill and vice versa that there was no way to use these

figures with any degree of certainty. Rounds also admitted using his original estimate in computing the cost of completing the sewage lagoons, but only because none of the lagoons had been constructed by June 29.

 It appears that, even though Summit would be excused from computing cost of completion based on actual costs incurred to June 30, 1962 since those costs reflect the disruption of the backfill and the consequent maneuvering of Summit's men and equipment due to Kiewit's breach, Rounds' estimates were not technically based on the initial estimates anyway. Rounds based his estimate of equipment costs on the Associated General Contractor's Cost of Ownership Manual in effect on June 30, 1962 (which happened to also be in effect and used by Summit when it made its original bid a year earlier). Although Kiewit points out that Rounds did not adjust the Manual's rates, as suggested by the Manual, to reflect Summit's own cost experience, nevertheless this rating method and Summit's cost experience in general were the subject of intensive cross-examination by Kiewit and evidently the rate charged by Summit was found to be reasonable by the jury. As to labor costs, Rounds utilized the rates under which the job was bid—even though those were not the actual rates it was paying on June 30, 1962—since Kiewit and Summit had an oral agreement outside the Subcontract that Kiewit would reimburse Summit for all increases above the labor rates existing on July 3, 1961.[21] This approach was proper as use of the increased labor rates would be washed out by a corresponding increase in the contract price.

 Kiewit further suggests that the Court erred in refusing to allow Kiewit to inspect certain tentative equipment rate schedules later kept by Summit as an experiment in which Summit charged itself rental on equipment it owned in order to develop cost experience in the field of equipment rental. In re-

---

21. *See* discussion, *infra* on this disputed issue under IV—Wage and Subsistence Claims.

ply to this contention, Summit maintains that these rates are irrelevant to any issue in the present case since they were first used long after Summit had ceased working for Kiewit under the contract at issue here. Also, these rates affected only a few of the pieces of equipment used in the backfill work. The trial court examined these rate schedules *in camera* and denied Kiewit's request to inspect them on the grounds the rates were first used long after the summer of 1962 and were thus irrelevant, and the rates were privileged information which Summit, Inc.,[22] as a competitor of Kiewit in certain areas, need not produce. We see no reason and Kiewit cites no cases which would lead us to overrule this determination of the trial judge.

■ As to the significant differences between Rounds' estimate of equipment costs in figuring costs of completion and the amounts he used in Summit's force account claim, Rounds testified under cross-examination that the higher costs during force account work were the result of operating under the supervision of someone else. The base rental charge as set forth in a Rate Book used by the South Dakota Highway Department and the Associated General Contractors of South Dakota provided the basis for Rounds' calculations on the force account. The Rate Book set forth a base rental rate for the first eight hours worked per day and one-half this base rate for each hour worked over eight hours and applied the same method of computation to standby time as to working time. Charge was made for a 20-hour day, which was the work schedule set by Kiewit. The equipment was required by Kiewit for the work requested and the crews were fielded at Kiewit's request regardless of weather and other delaying factors. The records reflect the type of operation required for the force account. The force account was hectic, a 20-hour day operation that was handled on a crash basis. These evidentiary matters were for the jury's consideration and we as an appellate court do not try issues *de novo*.

■ Kiewit's contention that Summit did not include the cost of completing Change Order No. 2, which consisted of backfilling around the brine lines at the launch control centers, appears immaterial as this cost was to be added to the contract price and was not a part of it.

■ Kiewit maintains that the furnishing of select material for backfill represented a substantial portion of the uncompleted part of the Subcontract and that in figuring its cost of completion Summit erred by assuming the 310,000 cubic yards of select which were called for in the invitation and bid meant "loose" yards, not "in-place" yards. Kiewit supports this assertion with two items: (1) a Subcontract provision which states that the price per cubic yard of select "in-place" backfill, if additional work needed to be done, is $2.70— exactly the same price per cubic yard contained in Summit's bid; and (2) a special provision in the Summit-Plant subcontract which states that the amount of gravel in the stockpile for backfill purposes was figured on an "in-place" basis. On cross-examination Rounds replied that the original invitation and bid figures for select backfill were based on "loose" yards and that he used these figures less the amount of select already furnished (according to the records of Summit's employee Leon Henry) to arrive at his figure of 128,918.5 cubic yards needed to complete the Subcontract. These issues are again evidentiary matters which were properly submitted to the jury for its determination.

In estimating the cost of completing the backfill part of the Subcontract, Rounds used the price it had subcontracted to pay Plant-Dartnell for this work, had that subcontract been performed.

---

22. The stockholders of Summit Construction Company and Summit, Inc., a new corporation, were in many cases the same. All of Summit Construction Company stockholders were stockholders of the new corporation along with some employees of Summit Construction Company.

This subcontract with Plant was no longer in existence on June 29, 1962, the agreed date of breach, but the probative value of the estimate was for the jury's determination.

Kiewit's assertion that the novelty of the work plus Summit's inexperience at this work preclude the possibility of Rounds' calculations being reasonably certain has been answered by this Court in Frank Sullivan Company v. Midwest Sheet Metal Works, *supra*, in which we refused to construe the reasonable certainty test as a bar to the admission of a reasonably compiled estimate by an experienced and competent contractor in recognition of the reality that to deny admission of such estimates would effectively prevent recovery in all construction cases. Summit was an experienced dirt contractor and Rounds' qualifications were significant: a civil engineering degree, 20 years in the contracting business, and chief estimator for Summit during that entire time.

## A. CLAIMED ERRORS ON DAMAGES

In Special Verdict No. 1 (the claim for loss or gain on the uncompleted part of the Subcontract) the trial court instructed the jury to "deduct the sum of $80,440" from any sum it found Summit entitled to under the Davis v. Tubbs formula. Summit's witnesses arrived at this $80,440 figure by taking the percentage of the total backfill work completed as of June 29, 1962 times its original backfill bid estimate (including profit) of $600,000. In Special Verdict No. 2 Summit was allowed to recover the full amount of its backfill expenditures to June 30, 1962, plus 15 per cent profit and overhead. The effect of this manner of submission, according to Kiewit, was to allow Summit to use: (1) the Davis v. Tubbs cost of completion rule on all items of the Subcontract except backfill, and (2) *quantum meruit* on backfill expenditures. This treatment of damages appears warranted because on work over

and beyond the contract or in addition to the contract either *quantum meruit* or cost plus must be applied; and on the Subcontract, loss of profit is proper.

Kiewit argues that this submission errs in accepting as a matter of law that $80,440 was contract value for the backfill done, rather than leaving this determination for the jury's decision, and errs in permitting a double recovery to the extent that backfill expenditures recovered on *quantum meruit* were expenditures which necessarily were incurred in the performance of the backfill portion of the Subcontract to June 30.

■ Kiewit's double recovery contention is without merit. The estimated bid cost of the backfill work including profit was $600,000. Summit's testimony was that about 13 per cent of the backfill work had been done, or in terms of contract value (which includes overhead and profit), $80,440 worth of backfill work had been done by June 30, 1962. Because of the vast change in scope of this backfill work as a result of Kiewit's breach, the completed backfill work was treated by Summit as an extra work claim for which *quantum meruit* recovery was sought and awarded. Since Summit was awarded $412,173.45 (for actual expenditures plus 15 per cent for overhead and profit) in *quantum meruit* for the completed backfill work,[23] the trial court correctly instructed the jury to reduce Summit's recovery for lost profits on the uncompleted part of the Subcontract proper by the $80,440 contract value of this completed backfill work. The $80,440 was a mathematical calculation used by the court to eliminate any double recovery on this submission, and was not a factual issue that should have been submitted to the jury.

■ Kiewit contends the trial court's Instruction 12 (on damages) was in error in instructing the jury that in determining Summit's cost of completion the quantities must approximate the quantities stated in Kiewit's invitation

23. These costs were documented in Exhibit 154 A-B, prepared by Frank Short, an independent accountant. Kiewit's objection to the award of profit is discussed, *infra*.

for bids. Kiewit asserts that the holding in State Highway Dept. v. MacDougald Const. Co., 102 Ga.App. 254, 115 S.E.2d 863 (1960), substantiates its contention in that Kiewit's invitation for bids and the Summit-Kiewit Subcontract expressly provide that it was a lump sum contract, which thereby should prohibit the quantities set out in its invitation from being controlling. The *MacDougald* case however is not apposite. *MacDougald* held that where the state highway department specifically stated in its invitation for bids that the quantities set out for the job were not guaranteed and were not binding on the department the contractor could not, under guise of mistake of fact, recover additional compensation because the material excavated contained a higher percentage of rock than represented. Inasmuch as the court instructed the jury to use Kiewit's estimates as approximations in making its cost of completion calculation, Kiewit's express disclaimer as to the accuracy of these estimates would not preclude their use in determining damages on the ground of lack of probative value.

█ Kiewit contends that Instruction 6 in the damages phase of the trial, which permitted Summit to eliminate general overhead expense in determining its cost of completion, enabled Summit to recover more than it would have actually received upon full performance of the Subcontract. There is a sharp division in the cases on whether overhead expense must be included as a cost of completion—requiring inclusion would, of course, have the consequence of reducing the recovery for lost profits by the amount of the overhead expense. *See* Annot., Overhead Expense As Recoverable Element of Damages, 3 A.L.R. 3d 689 (1965) for a discussion of this point. There are no South Dakota cases cited as controlling on this question and, therefore, we cannot fault the trial judge for taking a view of the law that has considerable support in other jurisdictions.

Kiewit also argues that the trial court improperly permitted the jury to include an item of profit in determining Summit's cost of doing backfill and thus the jury's award was excessive. Summit contends the extra work done in backfill was additional work under the contract and it was entitled to the reasonable value of the extra services performed. Reasonable value according to Summit must include a markup over the producer's out-of-pocket expense since to do otherwise would be to allow Kiewit, as the result of its own breach, to obtain Summit's work at the price of Summit's out-of-pocket expenses, a price far lower than Kiewit could obtain in the market place.

█ J. D. Hedin Construction Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70 (1965), cited by Kiewit, is irrelevant since *Hedin* is not a case involving extra work but rather damages for government-caused delays. A case which is in point and which lends strong support to Summit's position is Freund v. United States, 260 U.S. 60, 70, 43 S.Ct. 70, 74, 67 L.Ed. 131 (1922) where the Supreme Court held that a private contractor for a post office route could "recover the reasonable value of [its] services * * * including a fair profit" for extra work assigned by the Post Office Department, which was protested but carried out by the contractor in order to avoid a possible law suit by the Government against the contractor for breach of contract. Therefore, we find that the trial court did not err in allowing the jury to assess Kiewit with the reasonable value of Summit's services in doing the extra backfill work, and defined reasonable value correctly as including a reasonable markup above Summit's out-of-pocket expenses.

█ Finally, Kiewit's contention that Change Orders 1, 3, and 4 should have been considered not as separate claims but as part of the basic Subcontract under the rule of Davis v. Tubbs is of no moment since the work thereunder was completed and the only question was its reasonable value. Thus, the recovery would be the same whether considered as a separate claim or as a por-

tion of the Subcontract. In fact these claims were capable of more precise evaluation as separate items than as a part of the Subcontract. This protracted litigation was properly simplified by the trial court's treatment of these items as separate claims.

## B. EVIDENTIARY ISSUES ON DAMAGES

### 1. Proof of the Backfill Extra Work Claim

Kiewit asserts that plaintiff's Exhibit 473, which listed the equipment used on the backfill work and recorded the time spent by each piece of equipment on the job and the reasonable charge therefor, was improperly admitted since it was not a business record under federal law, 28 U.S.C. § 1732(a) [24] or state law, S.D.C.1960 Supp. § 36.1001 (now S.D. C.L.1967 Ann. § 19–7–11),[25] and did not qualify as a composite report under S.D.C.1960 Supp. § 36.1002 (now S.D. C.L.1967 Ann. § 19–6–14).[26]

Exhibit 473 was prepared in July and August 1962, after Summit had left the job but well before litigation ensued in November 1962. According to Summit, such records had not previously been kept by its central office since the Subcontract provided for a lump sum payment and was not conditioned upon the amount of equipment used or time elapsed. Even when the extra work was assigned Summit expected a payment equivalent to the reasonable value of its services and it was only when it became evident such payment was not forthcoming that Summit felt the necessity of compiling these records. The exhibit was prepared from daily diaries of foremen, memoranda, equipment cards, a calendar kept by the equipment shop foreman, and the personal knowledge of Summit's field coordinator.

Regardless of whether Exhibit 473 itself avoids the hearsay rule as a business record, since it could be said that the exhibit was not prepared in the regular course of business, it is clear that as a summary of other business records, still existing and kept in the regular course of business, such as the business diaries of the foremen, equipment cards and other memoranda, it is admissible. It also could be said the records were prepared in the regular course of business of Summit under the rather chaotic and hectic circumstances prevailing after the Subcontract was breached and the record was made within a reasonable time thereafter, in compliance with 28 U.S.C. § 1732(a), and the Uniform Business Records Evidence Act adopted by South Dakota as S.D.C. 1960 Supp. § 36.1001 (now S.D.C.L. 1967 Ann. § 19–7–11). Exhibit 473 was made in what was then the regular course of business of Summit at or near the time of the act, condition or event. It is unnecessary to belabor this point,

---

24. 28 U.S.C. § 1732 "Record made in regular course of business; * * *

"(a): In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter."

25. S.D.C.L.1967 Ann. § 19–7–11. "Admissibility of business records.—

The term 'business' shall include every kind of business, profession, occupation, calling, or operation of institutions, whether carried on for profit or not.

"A record of an act, condition, or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court, the sources of information, method, and time of preparation were such as to justify its admission."

26. See footnote 17.

however, as the exhibit is clearly admissible under the Uniform Composite Reports as Evidence Act adopted by South Dakota under S.D.C.1960 Supp. § 36.1002 (now S.D.C.L.1967 Ann. § 19–6–14), which permits a composite report of factual findings and conclusions resulting wholly or partly from written information furnished by several persons for a common purpose and prepared by an expert not a party to the cause, "if in the opinion of the court, no substantial injustice will be done the opposite party." The Court so indicated in this case.

■ Similar summaries of proper business records have been accepted in evidence in Youngs Drug Products Corp. v. Dean Rubber Mfg. Co., 362 F.2d 129, 134 (7th Cir. 1966) and in Hotevec v. Howe, 79 S.D. 337, 111 N.W.2d 748, 749–50 (1961). In Hotovec v. Howe, the Court quoted 4 J. Wigmore, Evidence § 1230, at 434 (3d ed. 1940):

> " 'Where a fact could be ascertained only by the inspection of a large number of documents made up of very *numerous detailed statements* * * * it is obvious that it would often be practically out of the question * * * [to require] the production of the entire mass of documents * * *. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who * * * will state summarily the net result.' "

Thus, under certain circumstances neither the business records exception to the hearsay rule, nor the best evidence rule are violated by the presentation of summaries of properly kept business records which if offered into evidence would themselves be admissible. Furthermore, here as in *Hotovec*, the actual records were in the courtroom, available to the defendant for its inspection, though they were not offered in evidence. The case of Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292 (3d Cir. 1961), cited by Kiewit, is inapposite as it deals with a bibliography of original articles obviously not written by any employee of the parties and not made available to the complaining party. Thus, we uphold the trial court's discretion in admitting Exhibit 473 into evidence.

2. **Proof of Other Extra Work Claims**

Similarly, Kiewit contends that the records used by Summit to prove the dollar amount of its extra claims should not have been admitted since they were not proper business records under either S.D.C.1960 Supp. § 31.1001 (now S.D.C.L.1967 Ann. § 19–7–11), or 28 U.S.C. § 1732(a). However, the cases of Youngs Drug Products Corp. v. Dean Rubber Mfg. Co., *supra*, and Hotovec v. Howe, *supra*, apply equally well to the records involved here.

■ The records used to prove these claims are denominated "face sheets" and represent invoices prepared from diaries of foremen, time cards, and payrolls during and reasonably near the time the extra work was being performed and later presented to Kiewit. These records are thus clearly admissible as summaries of other properly prepared business records. Furthermore, being invoices or statements prepared in what had become the normal course of business, they would be admissible as business records. Missouri Pac. R. R. v. Austin, 292 F.2d 415 (5th Cir. 1961). The cases of Clark v. Bergen, 75 S.D. 45, 59 N.W.2d 250 (1953) and Plank v. Heirigs, 156 N.W.2d 193 (S.D.1968) cited by Kiewit, indicate no rule of law which would require us to reverse the trial court's determination on this issue. Since these invoices were prepared from original business records for the purpose of collection, Kiewit's contention that the face sheets were prepared only for litigation is likewise not well taken.

3. **Proof of the Force Account Claim**

The jury allowed Summit the full amount of $81,083.47 for the unpaid items of the force account in Special Verdict No. 5. Kiewit maintains that

under the force account claims,[27] as under the extra work claims and the cost of backfill claims, the records introduced by Summit to support these claims were erroneously admitted since they were not business records under either S.D.C. 1960 Supp. § 36.1001 (now S.D.C.L.1967 Ann. § 19–7–11), or 28 U.S.C. § 1732(a).

The basis of Kiewit's claim is that Exhibits 252 and 253, while based in part on business records such as daily equipment reports prepared by foremen in the field, also contained penciled-in alterations, additions, and changes made just prior to the damages phase of the trial, long after the events actually took place. The alterations were usually additions to the amount of equipment originally listed as working on the job and to the number of hours per item of equipment for which Kiewit was liable. Most of the hours added were for time during which the equipment required by Kiewit to be at the jobsites was available but not in actual use.

■ It is apparent from the record that the alterations to the foremen's reports were made in the field by field supervisors, usually on the evening the foremen's reports were turned in. Most of the changes made were for the purpose of adding items which had not been noted by the foremen in their reports either due to the lack of time and the exigencies of field work, or the trivial nature of the items, or their lack of immediate relevance to the job at hand. Nevertheless, these items were known to the foremen and were added to the work sheets only after the field supervisor checked with the foremen. It is clear that in their final form, these work sheets, as prepared on the jobsite and made in the normal course of business at a time virtually contemporaneous with the events themselves, were admissible as business records.

■ Kiewit's contention that Instruction 13, which ordered the jury to assess Kiewit on the basis of the reasonable value of the rental of the equipment used during the force account period, was in error is without merit. Kiewit cites no authority which holds that this instruction was erroneous and is without evidentiary support for its own suggested instruction that Summit could not recover for equipment not used because of Summit's own defalcation.

## IV. WAGE AND SUBSISTENCE CLAIMS

Kiewit challenges the jury's award of $74,524.71 to Summit for certain wages and subsistence payments made by Summit in excess of a July 3, 1961 minimum wage determination made by the United States Department of Labor.[28] This wage determination was used in preparing both Kiewit's bid on the prime contract and Summit's bid on the Subcontract and became part of the specifications of the Subcontract.

The record shows that the specifications for the project contained the above-mentioned schedule of minimum wages, but this schedule made no provision for subsistence payments. The Subcontract included this wage schedule and a covering letter which stated that Kiewit would process a claim by Summit for an increase in the contract price if minimum wages were increased by the Government under new wage specifications.

Summit contends through the testimony of its president, Charles W. Rounds, that an oral agreement was reached on August 17, 1961, to the effect that Kiewit would reimburse Summit for all wage and subsistence payments made by Summit above the July 3 Government wage specifications whether such increased payments were the result of an upward revision of minimum

---

27. The labor claims were paid by Kiewit at the time the force account work was performed and we are concerned here only with the equipment charges.

28. The jury awarded Summit the full amount requested on this item. Kiewit admits liability for part of this amount but claims the award is excessive as embracing expenses not agreed to by it.

wages by the Government or were required for some other reason.

Rounds explained that when Kiewit requested a bid from Summit on August 17, 1961, Kiewit requested that Summit use the July 3 wage specifications in preparing the bid, though Kiewit knew that a new wage specification was forthcoming, as Kiewit in preparing the prime bid also had used the July 3 specifications and wished to be able to compare Summit's bid with its own estimate. Then, since it was contemplated that the bid would in essence become the contract, Kiewit orally agreed to make all additional wage and subsistence payments that would accrue, according to the testimony of Rounds.

Subsequent to execution of the Subcontract on August 21, 1961 Kiewit made separate wage arrangements with several of the craft unions working for Kiewit and Summit. As a result of these arrangements and the new labor wage specifications, Summit was immediately met with a work stoppage by the Craft of Skilled Equipment Operators. Summit agreed to make the extra wage and subsistence payments arranged with this union by Kiewit, and Kiewit by letter of September 16, 1961 agreed to pay the wage differential to Summit. However, Kiewit in its letter limited its obligation to pay the increased wages to the operators craft only and also refused to pay any subsistence. Summit complained of the lack of subsistence payments by letter of September 27, 1961. On April 24, 1962 Kiewit agreed to make subsistence payments for elapsed travel time to and from the jobsite but limited these payments to members of the Teamsters Union. Thus, Kiewit conceded its liability to make certain payments in addition to those required in the contract, but attempted to attenuate this liability by refusing to reimburse Summit for wage escalations to other workers such as carpenters and foremen, and by refusing reimbursement for all subsistence payments except to Teamsters, in spite of the fact that these additional liabilities were incurred by Summit.

Kiewit suggests that in Aetna Cas. & Surety Co. v. United States ex rel. R. J. Studer & Sons, 365 F.2d 997 (8th Cir. 1966), a case involving the same missile project and some of the same wages and subsistence claims as in the case at bar, this Court reversed a jury finding that Studer, a subcontractor of Summit, was entitled to the same additional wage payments from Kiewit which Summit claims here. But in Aetna this Court held "there is simply no evidence in the record that any other increases were authorized." Studer presented neither testimony nor exhibits to support its claim to the additional payments. In the instant case Summit presented the testimony of Rounds as to the oral agreement with Kiewit and presented Exhibit 479, which is a record of the additional wage and subsistence payments actually made by Summit. Thus, in the instant case there is evidence to support the jury finding.

Kiewit next suggests that the parol evidence rule prevents admission of Rounds' testimony, claiming that Rounds' testimony refers to an antecedent oral agreement in contradiction of the written contract. Kiewit points out that the parol evidence rule is substantive law in South Dakota. Kindley v. Williams, 76 S.D. 225, 76 N.W.2d 227, 57 A.L.R.2d 1070 (1956); Janssen v. Tusha, 66 S.D. 604, 287 N.W. 501 (1939). In the former case the Court held at 229 quoting from Farmers' Elevator Co. v. Swier, 50 S.D. 436, 210 N. W. 671, 673 (1926):

"'* * * where a contract which has been reduced to writing and executed by the parties is complete, clear, and unambiguous in its terms * * * the contract, in the absence of fraud, mistake, or accident, cannot be changed or modified by parol or extrinsic evidence * * *.'"

But as noted in Janssen, 287 F.2d at 504: "It is elementary that the parol evidence rule only has application to such transactions as are here involved when the parties have adopted a writing or writings as the definitive expression or

integration of their agreement." Here admittedly the Subcontract was open to certain modifications on costs and other allowances that were the subject of current or expected negotiations with the union representatives of the various crafts on the job.

■■■ A recognized exception to the parol evidence rule is that parol evidence is admissible where the contract is not complete on its face, or is not intended by the parties to be complete. J. I. Case Threshing Mach. Co. v. Buick Motor Co., 39 F.2d 305 (8th Cir. 1930); 3 A. Corbin, Contracts § 584 (1960). *See* Taylor v. Nissen, 58 S.D. 299, 235 N.W. 703 (1931). It is quite clear in the instant case that the Subcontract was not a complete integration of the agreements between the parties. Kiewit itself makes no objection to the introduction of letters in which Kiewit admitted liability additional to that stated in the contract regarding the Operators Union and the Teamsters. These letters, being subsequent to the signing of the contract, do not run afoul of the parol evidence rule, and they present irrebuttable evidence of the fact that some oral agreements were made either antecedent to or contemporaneous with the contract, and that those agreements were intended to be part of the agreement as a whole, though not expressed in the written contract.

In plaintiff's Exhibit 170, the letter of September 16, 1961 from Kiewit to Rounds, it is stated:

"In accordance with the commitment made to you at the time you submitted your subcontract bid, we will, in the event you must, in order to get your work going, pay the rates for Operating Engineers contained in our Agreement with them (which rates are in accordance with the most recent Department of Labor wage predetermination for the project) reimburse you for the difference in cost between such rates and the rates upon which you based your bid * * *."

■■■ Kiewit admits an oral agreement was made but contends the oral agreement to reimburse Summit for wage escalations was limited to wage increases for the Operating Engineers. However, having admitted the existence of an antecedent oral agreement that was intended to be part of the total agreement, though not integrated into the written contract, Kiewit cannot deny Summit the right to present evidence as to its version of the oral agreement.

In the liability phase of the trial the jury found that Kiewit had agreed to reimburse Summit for all extra wages and subsistence payments incurred in the performance of the Subcontract above the wage rate level of the July 3 specifications. In the damages phase of the trial the jury awarded $74,524.71. Since the testimony of Rounds was properly admitted, we find sufficient evidence in the record to support the jury verdict on this issue.

## V. FAILURE TO DEFINE THE ISSUES

Kiewit concedes that it was permissible for Summit to plead in good faith tort and breach of contract as alternative theories of recovery but claims the trial court's failure to ascertain and define the exact character of Summit's claim forced Kiewit to attempt to do so by extensive cross-examination, with the consequence that Kiewit lost the sympathy of the jury, and enabled Summit, throughout the trial, to make inflammatory arguments and remarks under the protective cloak of the tort pleading. More specifically, Kiewit asserts that remarks by Summit's counsel that Summit was broke and its business had been destroyed would have been impermissible in a simple breach of contract action.

While we concur in the admission of Summit's counsel that Summit's amended complaint was no work of art, we think our finding that there was sufficient evidence to warrant submission of the tort issue to the jury is dispositive of this contention of Kiewit's. The same facts which constitute a breach of contract may also constitute a tort. Smith v. Weber, 70 S.D. 232, 16 N.W.2d

537 (1944); 86 C.J.S. Torts § 3 (1954); W. Prosser, Handbook of The Law of Torts 639–43 (3d ed. 1964).

Federal Rule of Civil Procedure 8(e) (2) clearly permits setting forth two or more statements of a claim alternately or hypothetically and stating as many separate claims as may exist regardless of consistency, subject of course to the qualification that the plaintiff's attorney must sign the complaint, his signature constituting a certificate that he has read the pleading and to the best of his knowledge, information and belief there is good ground to support it and it is not interposed for delay. Fed.R.Civ.P. 8(e) (2), 11, 18(a); [29] Stewart v. Shanahan, 277 F.2d 233, 236 (8th Cir. 1960); Herlihy Mid-Continent Company v. Bay City, 293 F.2d 383, 385 (6th Cir. 1961).

■■■ We are aware of the need for particularization of the issues in a protracted trial of this nature, involving nearly 6000 pages of testimony and over a thousand written exhibits. That attorneys must make a conscientious effort in this regard was emphasized by the Third Circuit Court of Appeals in Viking Theatre Corp. v. Paramount Film Distributing Corp., 320 F.2d 285 (3d Cir. 1963):

> "The key to the manageable trial, and essential to the maintenance of an orderly record, is a specification of issues with particularity. We recognize the reluctance of many lawyers to be specific less they thereby forego some advantage which might unexpectedly develop in the course of the trial. Whatever their objection, the necessity for specification of issues in the protracted case is so great as to require it. Absent such specification, the trial 'cannot be confined to its proper limits, counsel are at a loss as to their positions, and the judge is unable to relate the evidence to issues which are in dispute or to limit it to that which is relevant.' Prettyman

Report, 13 F.R.D. at 66–67." *Id.* at 300–01.

Indeed, there are some old cases which condemned pleadings in which alternative or inconsistent allegations or theories were so intermingled that the court was unable to determine what the plaintiff was alleging. Catanzaritti v. Bianco, 25 F.Supp. 457 (M.D.Pa.1938); *see generally* 2A J. Moore, Federal Practice, ¶ 8.33, at 1893 (1968 ed.). Nevertheless, though Summit's amended complaint is hardly simple, concise and direct, Summit's overlapping and duplicative allegations of breach of contract, intentional interference with a contractual relation, and quantum meruit for extra work were sufficiently clear and understandable that Kiewit was not prejudiced thereby. The number and variety of issues alone made for extensive pleadings in this case. Understandably, duplications of factual allegations ofttimes are necessary to place a series of claims in proper context.

We think the trial judge did an admirable job in keeping the issues separate and understandable, taking particular care to avoid and to not allow duplicative claims. The evidence often defines and shapes the issues and a trial judge should not be faulted for failing to precisely define the issues before trial, particularly where counsel for the respective parties are not in accord on the issues.

## VI. PRE-JUDGMENT INTEREST

After the jury had returned its verdicts and had been discharged, Summit moved to have pre-verdict interest added to each of the special verdicts. Over Kiewit's objection the Court entered an order awarding the pre-verdict interest.

Kiewit's first contention is that under the Seventh Amendment to the United States Constitution and under the common law, the trial court was without power to add interest to a final jury verdict. Kiewit maintains it is a

---

**29.** Rule 18 was amended in 1966 (after the trial of this case), but the amendment in no way affects that part of the rule pertinent here.

usurpation of the jury's function for the trial court to make an addition to a final jury verdict, citing Mutual Ben. Health & Accident Assoc. v. Thomas, 123 F.2d 353 (8th Cir. 1941) and First Nat'l Bank v. Herold, 56 S.D. 547, 229 N.W. 521 (1930).

Both of these cases are inapposite. In *Thomas* the issue was not the addition of pre-verdict interest but the complete alteration of the jury's damage award. It is clear in *Thomas* that the court did more than merely add interest since the verdict was reformed by the court from a jury verdict of $1,750 to a final verdict of $22,276.55. Rather, the court refused to accept the jury's finding as to the extent of liability and substituted its own.

In *Herold* the court instructed the jury, if it found for the plaintiff, to return a lump sum verdict combining the principal amount due on a delinquent note with the interest. After the jury returned its lump sum verdict, the court on motion purportedly added further interest to the verdict. But since "[t]here is no certainty that the jury had not already allowed interests," it was error for the court to do so. First Nat'l Bank v. Herold, *supra* at 522. Thus, as in *Thomas,* the court substituted its judgment for the jury's as to the extent of the defendant's liability.

■ Summit correctly points out that there is an obvious distinction between the actions of the judges in *Thomas* and *Herold* and the interest award of the trial court in the instant case. Here Summit moved for an award of 6 per cent in pre-judgment interest on each special verdict. The question of whether to award this interest is strictly a legal question determined by state law. There is no issue of fact on which the jury may rule. Its function is to determine the damages, and then it is a mere arithmetical procedure to add interest if under local law interest may be awarded.

■ There is no constitutional barrier or common law proscription against the allowance of pre-verdict interest by

the court. Stentor Electric Mfg. Co. v. Klaxon Co., 125 F.2d 821, 826 (3d Cir. 1942), on remand from 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Eugene B. Smith & Co. v. Russek, 212 F.2d 338 (5th Cir. 1954); Ocean Accident & Guar. Corp. v. Schachner, 70 F.2d 28 (7th Cir. 1934).

The rationale for adding pre-verdict interest is appropriately stated in Engelberg v. Sebastiani, 207 Cal. 727, 279 P. 795, 796 (1929):

"Plaintiff being entitled to interest in the amount allowed by the court as a matter of law upon the pleadings and proof, there was no issue of fact as to interest to be submitted to the jury. Although it is the right of the parties litigant in an action where a trial by jury is had as a matter of right to have every triable issue of fact submitted to the jury, in the instant case, had the court instructed the jury as to the matter of interest, plaintiff was entitled as a matter of law to an instruction directing the jury that if they should find for plaintiff to allow interest upon the demands in suit. Since the jury would be without right to disregard the court's direction, which would leave them no discretion in the matter, it can make no substantial difference to defendant whether interest is added to the judgment by the verdict of the jury rendered pursuant to the direction of the court, or by the court instructing the clerk to enter judgment for the amount of the verdict plus interest. In adopting the latter procedure, the court is usurping no function of the jury, for there is no issue of fact involved as to said interest."

■ South Dakota law permits the allowance of pre-verdict interest. S.D.C. 1960 Supp. § 37.1711 (now S.D.C.L.1967 Ann. § 21–1–11) provides:

"Interest awarded on damages certain.—Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vest-

ed in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt."

This statute and its identical predecessors have been construed at least four times by the South Dakota Supreme Court and once by the United States Court of Appeals for the Eighth Circuit. The rule announced by the South Dakota Supreme Court in Beka v. Lithium Corp. of America, 77 S.D. 370, 92 N.W.2d 156 (1958) stands as the determinative interpretation of this statute. There the plaintiff sued for breach of contract and recovered, the chief issue being the cost of completion under the contract. Plaintiff testified that the going market rate for hauling 1000 tons of material (the portion of the performance remaining to be completed) was about 50 cents a ton. Over defendant's objection the court awarded pre-verdict interest on the contract price minus the remaining cost of performance of $500. The court said at 159:

"The mere fact that the claim is disputed does not defeat the allowance of interest. Corcoran v. Halloran, 20 S.D. 384, 107 N.W. 210. As applied to this case our statute was construed by this court in Gearhart v. Hyde, 39 S.D. 273, 164 N.W. 58. The rule announced in that case is that interest is allowable on damages if there exists established or reasonably ascertainable market prices or values of the subject matter by reference to which the amount due may be determined by computation."

In the case of Corcoran v. Halloran, 20 S.D. 384, 107 N.W. 210 (1906), relied upon by the court in Beka, the court allowed pre-verdict interest on an amount due for labor computed at $3 per day which plaintiff therein testified was the market rate for such labor. In Aetna Cas. & Surety Co. v. United States ex rel. R. J. Studer & Sons, 365 F.2d 997 (8th Cir. 1966), which dealt with another segment of the instant controversy, the

court followed Beka and allowed pre-verdict interest after a determination that the market rate for certain backhoe excavation work was $1.75 per cubic yard. In all of the above cases the market rate was disputed but was found by the court to be reasonably ascertainable by the parties.

In Gearhart v. Hyde, 39 S.D. 273, 164 N.W. 58 (1917) the court stated the rule later followed in Beka but refused to allow pre-verdict interest. There, however, the principal amount due was the result of personal services by a physician, the market value of which was held not to be readily determinable.

In State ex rel. Farmers State Bank v. Ed Cox & Son, 81 S.D. 165, 132 N.W. 2d 282 (1965) the court refused pre-verdict interest where the principal amount in dispute was the value of work performed under a construction contract. The court did not purport to retreat from the rule in Beka but found that the defendants could not have known the extent of their liability under the circumstances therein. The court did not indicate why the value of the services involved therein was not readily calculable.

Kiewit has not demonstrated that the trial judge improperly interpreted and applied the South Dakota statute and the relevant South Dakota cases in allowing pre-verdict interest in each of the special verdicts. The cost of completion necessary to the determination of damages under Special Verdict No. 1 was readily ascertainable by resort to market prices for labor and materials, and since Kiewit breached the Subcontract it should be assumed that completion was possible (as testimony indicates it was) within the stipulated contract date, from which date interest was calculated. The cost of equipment usage under Special Verdict No. 2 was ascertainable by reference to the Associated General Contractors' Cost of Ownership Expense Manual. Special Verdict Nos. 3–15 were all readily calculable either by resort to market prices, or by the fact that charges had already been made for identical por-

tions of the work, and thus had an already determined cost price.

■ It is our opinion that the trial court has not abused its limited discretion in its award of pre-verdict interest.

## VII. SUMMIT'S CROSS-APPEAL, CASE NO. 18560

Summit urges that the trial court erred in refusing its offer of proof on consequential damages (1) in relation to attorney's fees, investigative expenses and other litigation costs incurred by (a) General in connection with this case but indemnified by Summit and (b) Summit in legal disputes with its subcontractors and paid as separate items not in connection with this case; and (2) of loss of anticipated profits on its operation as an established business.

■ The common law rule and the rule in South Dakota is that "each litigant pays for the services performed by his attorney and in the absence of a special agreement or statutory provision no part thereof except as taxable costs can be recovered from his adversary." Dodds v. Bickle, 77 S.D. 54, 85 N.W.2d 284, 289 (1957) (citing S.D.C. § 33.-1802). Kiewit asserts that this general rule, which has been codified in S.D.C. 1960 Supp. § 33.1802 (now S.D.C.L.1967 Ann. § 15–17–6),[30] bars Summit from recovering any attorney fees or litigation expense as consequential damages for Kiewit's breach.

■ 1(a). We think the attorney's fees, investigative expenses and other litigation costs incurred by General in connection with this case and in turn charged against Summit by reason of its indemnity agreement with General are expenses that are clearly within the ambit of § 33.1802. The fact that the expenses were initially incurred by General rather than by Summit is immaterial since they are expenses incurred in connection with this case. Absent the indemnity agreement General, of course, would have to bear its own expense under the South Dakota law and the statute. The fact then that this expense by contract is imposed upon Summit does not in turn give Summit a right to circumvent the statute and recover such expenses as damages against Kiewit.

■ 1(b). The expenses incurred by Summit in connection with disputes, negotiations and litigations with its subcontractor could conceivably fall in a different category than the expenses incurred in connection with this case. The South Dakota case of DuPratt v. Black Hills Land & Abstract Co., 81 S.D. 637, 140 N.W.2d 386, 389 (1966), held that § 33.1802 and prior South Dakota cases barring attorney's fees "govern attorneys' fees allowed as costs in the immediate action but do not govern attorneys' fees as an item of damages in a subsequent action." However, this seemingly unlimited language in *DuPratt* is misleading for the court merely gave effect to a state statute, S.D.C. § 1.0107 (now S.D.C.L.1967 Ann. § 36–13–15), making abstractors liable for any and all damages incurred by reason of a mistake in an abstract and held that attorney's fees and other costs of litigation were the natural and proximate consequences of the error in the abstract. This is but a recognition of the statutory liability of an abstractor and also probably represents the common law liability of an abstractor, a point, however, we need not reach.

The consequential damages claimed as the result of expenses of other litigation and disputes with subcontractors could be viewed as not barred by the statute. But neither are they covered by an agreement and they do not appear to be the natural and proximate result of the contractual breach by Kiewit. Whether

---

30. The revelant part of S.D.C.1960 Supp. § 33.1802 reads:
 "33.1802. *Attorney's fees: not generally allowed as costs;* * * * The compensation of attorneys and coun-selors at law for service in civil and criminal actions and proceedings must be left to the agreement, express or implied, of the parties."

Summit subcontracted its work was a personal decision for it to make and it had the responsibility of dealing with its subcontractors. Many facets of its disputes with its subs could arise independently of any breach by Kiewit.

Summit has cited no case where attorney's fees and investigative expenses incurred in connection with a subcontract were allowed as damages for the breach of a construction contract over and above the amount of damages allowed for the loss of profit on the construction contract. There are cases holding generally that a party has a right to recover as damages attorney's fees incurred in earlier litigation with a third person resulting from a breach of the contract in question. *See* Annot., Attorneys' Fees Incurred in Litigation with Third Person as Damages in Action for Breach of Contract, 4 A.L.R.3d 270 (1965). However, the cases discussed in the annotation are distinguishable on their facts and the only case mentioned involving a construction contract, Gates v. City of Toledo, 57 Ohio St. 105, 48 N.E. 500 (1897), held that the contractor was not entitled to recover as damages expenditures for counsel fees incurred in litigation against third parties. Nor has Summit cited any construction case wherein as a matter of legal principle recovery of attorney's fees and other litigation expenses incurred in connection with third parties, but alleged to have resulted from the breach, were allowed. No South Dakota cases are cited and the principal cases relied upon by Summit of Wells v. Aetna Ins. Co., 60 Wash.2d 880, 376 P.2d 644 (1962) and Prentice v. North American Title Guar. Corp., 59 Cal.2d 618, 30 Cal.Rptr. 821, 381 P.2d 645 (1963) are not in point. *Wells* is concerned with a motor vehicle dealer's license bond, and *Prentice* is a tort action.

Obviously a different principle applies in tort actions where the law generally allows damages that occur as the natural and proximate consequence of the tortious act. *See generally* W. Prosser, Handbook of The Law of Torts 640–41 (3d ed. 1964). Although there might be factual situations arising in a contract action that might permit recovery of attorney's fees incurred in litigation with third parties, we do not think that Summit has proved the trial judge was in error in refusing testimony relating to that issue. It would appear that Summit has been accorded legal satisfaction in full by recovering its loss of profits (with pre-verdict interest) on the Subcontract resulting from Kiewit's breach and that the attorney's fees claimed as consequential damages are too removed and are not encompassed within the formula for ascertaining damages occasioned by the breach of the Subcontract.

2. Summit contends it is entitled to damages resulting from an anticipated loss of profits as an established business concern. Its theory is that if the Subcontract had not been breached it would not only have received the profits resulting from the breached contract, which have been allowed, but also would have been able to continue as an operating business, making profits from other contracts and such other business as it might have secured.

Summit cites for a basis of recovery S.D.C.1960 Supp. § 37.1801 (now S.D. C.L.1967 Ann. § 21–2–1), which provides:

"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin."

The above statute codifying the common law has been construed to limit damages to those reasonably within the contemplation of the parties at the time of the making of the contract. Ther-

moid Rubber Co. v. Brictson, 39 S.D. 114, 163 N.W. 567 (1917).

 The fact that Summit provided the capital for the new corporation, Summit, Inc., is a complicating factor which we need not discuss as we do not think the law of South Dakota permits the recovery of future anticipated profits as an element of damages resulting from the breach of a contract, where the injured party has recovered the amount it would have made had the contract not been breached. Certain types of tort actions and anti-trust suits can encompass loss of future profits and contracts for the delivery of goods at a certain price for resale may also be the basis for a proper claim of loss of future profits. Pace Corp. v. Jackson, 155 Tex. 179, 284 S.W.2d 340 (1955). But in those types of cases the breach directly occasioned the loss of future profits, which were substantially the only measure of damages. But generally in connection with a breach of contract we do not think the parties by their contract seek to underwrite the other's loss of future anticipated profits in the event the contract is breached. Future anticipated profits over and beyond those resulting from the contract in question itself appear to be not only remote but conjectural and speculative at best. Summit has not cited any South Dakota case or for that matter any other case that allowed a recovery for future anticipated profits in a similar factual situation. In addition it appears speculative whether Summit and its principal stockholders through their new corporation, Summit, Inc., suffered any loss of future profits.[31]

We, therefore, cannot say that the trial judge was in error in refusing testimony relating to this issue, nor does it appear that the trial judge has misconstrued the South Dakota law. Adoption of Summit's theory would have placed an unwarranted burden of liability for breach of contract far beyond the contemplation of the parties and also far beyond the proximate damages resulting from a breach of that contract. Whether an established concern can continue business depends on many factors, such as adequate financing, competent personnel, and ability to secure business. While a breach of contract might make it difficult for one concern to continue business by reason of lack of immediate funds, the same breach with another concern more favorably situated might not have any effect at all on its continuance as an operating business. We, therefore, do not think that the trial judge erred in refusing to include future anticipated profits as an element of Summit's consequential damages for the breach of the Subcontract.

## VIII. GENERAL'S CROSS-APPEAL, CASE NO. 18561

In its cross-appeal General presented alternative grounds to support its contention that the trial court erred in not entering a judgment completely exonerating General under its surety contract with Summit.[32] Inasmuch as General is a prevailing party and is not subject to any liability by our affirmance of the District Court's judgment, we need not reach the issues presented in General's

---

31. The record shows that Summit, Inc. was organized in 1963 and became active in the same contracting field as Summit Construction, reaping a gross income of $1,409,935.20 in its first year 1963. Summit Construction had a 1963 gross income of $1,170,118.71 and a 1963 net income of $40,933.98. In 1964 Summit Construction had income from equipment rent and other sources totaling $1,019,-589 with a net of $262,913. In the same year, Summit, Inc. had a gross income

of $3,169,450, which is only slightly less than Summit Construction's $3,384,891.54 gross income figure for 1961, its biggest year. We can only view Summit's claim for loss of future anticipated profits with skepticism when it is realized that 1964 was Summit Construction's biggest year ever in terms of net income ($262,913), and this only a year or so after Kiewit's breach.

32. See text accompanying footnote 5, supra.

cross-appeal and consequently we express no opinion on the merits of these issues.

We think the parties had a fair and impartial trial and no prejudicial error was committed. The judgment is affirmed.