**PLANTATION KEY DEVELOPERS, INC., a Florida Corporation, Plaintiff-Appellee Cross Appellant,**

v.

**COLONIAL MORTGAGE COMPANY OF INDIANA, INC., an Indiana Corporation, and Southern Colonial Mortgage Company, an Indiana Corporation, Defendants-Appellants Cross Appellees.**

No. 76–3055.

United States Court of Appeals, Fifth Circuit.

Feb. 6, 1979.

Rehearing Denied March 20, 1979.

Guy B. Bailey, Jr., Miami, Fla., for defendants-appellants cross appellees.

Ronald A. Shapo, Jerome H. Shevin, David A. Freedman, Miami, Fla., for plaintiff-appellee cross appellant.

Before GOLDBERG, Circuit Judge, SKELTON *, Senior Judge, and FAY, Circuit Judge.

FAY, Circuit Judge:

This is an action brought by a condominium project builder, Plantation Key Developers, Inc. ("Plantation"), against its permanent lender, Colonial Mortgage Co.[1] ("Colonial"), based on breach of contract and fraud.[2] The trial court directed a verdict against Plantation on its fraud claim. The jury returned a verdict of $60,000 in favor of Plantation on its contract claim. The Court entered judgment thereon for $60,000 plus interest and costs. Colonial raises three points on appeal: 1) the breach of contract issue should not have been submitted to the jury; 2) Plantation failed to prove any damages; and 3) the trial court erred in awarding pre-judgment interest to Plantation. Plantation cross-appeals the directed verdict on the fraud count.

The dispute arose from a loan arrangement between Colonial and Plantation. Plantation was formed for the purpose of constructing a condominium project on Plantation Key, Florida. Through a mortgage broker Plantation contacted Colonial, a mortgage lender, for the purpose of obtaining permanent financing[3] for the condominium project.

In November 1973 Colonial promised to provide permanent mortgage funds through

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1. There are actually two defendants in this action: Colonial Mortgage Co. and Southern Colonial Mortgage Co., a subsidiary. They are both referred to as "Colonial."

2. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332.

3. In order to facilitate an understanding of this opinion, we provide a brief description of the business relationships involved here. The builder is in the business of building condomin-

1975 to Plantation. The agreement[4] provided for performance in three parts. First, Colonial agreed to provide mortgage money through December 31, 1974 at the rate of 9% plus a loan service fee (points) of 3½% of the loan amount. Second, Plantation had the option to extend the commitment for six months "with adjustments in interest and points made if market conditions so demand." Finally, the agreement provided for another six month extension of the commitment with the same interest and point adjustments. Plantation paid a non-refundable commitment fee of $60,000. In addition, Plantation agreed to pay $30,000 each time it chose to bind Colonial to a six month extension.

The dispute is based on Colonial's adjustment of the interest rates and service fees for the first extension, January 1, 1975 to July 1, 1975. Colonial proposed to extend the commitment with the rate changed to 9¾% and 9 points. Plantation contended that these rates were inconsistent with Colonial's promise to make rate adjustments only in response to "market conditions." Plantation refused to pay $30,000 for an extension at the rates of 9¾% interest and 9 points. Instead, it brought this action.

## I. BREACH OF CONTRACT

Colonial presents an arsenal of legal theories as the grounds upon which it is excused

iums for resale. In order to finance a construction project, the builder obtains a construction loan. The permanent lender agrees to make mortgage loans to purchasers of the units. This serves the function of encouraging sales. Part of the money which the purchaser pays to the builder goes to the construction lender, who is eventually paid off entirely. If the builder wants to be certain, at the commencement of construction, that mortgage loans will be available to prospective purchasers at the completion of the project, he pays the permanent lender a commitment fee in exchange for the lender's agreement to offer mortgage loans at a certain rate for a specified period of time. In making such a commitment, the permanent lender runs the risk that interest rates may rise and it is committed to offering loans at less than the market rate.

4. The November 30, 1973, commitment letter reads in pertinent part as follows:

[Colonial agrees] to make conventional mortgage loans not to exceed . . . $3,000,-000, subject to the following terms and conditions.

\* \* \* \* \* \*

2. This commitment shall be valid through December 31, 1975. At the option of [Colonial] . . . a review and adjustment of interest rates and loan closing fees will be made on January 1, 1975, and July 1, 1975, with adjustments made if market conditions so demand. Market conditions shall include but not be limited to the prevailing interest rates charged by national lending institutions who commit on comparable condominium projects.

\* \* \* \* \* \*

12. All loans will be closed at an interest rate of not more than 9% per annum on loans closed prior to December 31, 1974. Interest rates for all loans closed subsequent to January 1, 1975, will be established by [Colonial's] . . . review of January 1, 1975, and July 1, 1975.

13. As each individual loan is closed by December 31, 1974, a loan service fee of 3½% of the loan amount will be charged. As each individual loan is closed subsequent to January 1, 1975, a loan service fee as established by . . . [Colonial's] review of January 1, 1975, and July 1, 1975, will be charged accordingly. Normal closing costs and out of pocket expenses will be collected at the time of each individual closing.

\* \* \* \* \* \*

17. Upon acceptance of this commitment, Summersea Condominium hereby conveys to [Colonial] . . . a 2% non-refundable commitment fee in the amount of $60,000: One-half percent of the fee ($15,000) to be paid upon receipt of this letter as a deposit for this agreement. The remaining 1½% fee ($45,000) may be paid out of the first construction disbursement, but in any event, no later than January 30, 1974. All of the aforementioned fees are non-refundable and are compensation for the issuance of this letter and commitment. If the above fee is not paid this commitment becomes null and void and any deposit shall be forfeited as liquidated damages.

An additional 1% fee ($30,000) to be paid for the first six month extension commencing January 1, 1975 through June 30, 1975, with [Colonial's] . . . option to review interest rates and closing fees. An additional 1% fee ($30,000) to be paid for the second extension commencing July 1, 1975, through December 31, 1975, with [Colonial's] . . . option for interest rate review and closing fees review.

from performance of the first six month option, regardless of the reasonableness of its adjustment of the rates. It argues: 1) Plantation's payment of the extension fee was a condition precedent to suit; 2) the quotation and extension fee were dependent covenants; 3) the quotation and the extension fee were concurrent conditions; 4) Plantation's failure to tender the extension fee was a breach which excused Colonial from performance; and 5) the option lapsed due to Plantation's failure to exercise it. The essence of Colonial's argument is that Plantation cannot complain that the quoted rates were violative of the contract since it did not tender the $30,000 for the six month extension. Both the authorities and the reasoning relied upon by Colonial are unpersuasive.

Colonial fails to recognize its agreement for what it is, an option contract. An option contract has two elements: 1) the underlying contract which is not binding until accepted; and 2) the agreement to hold open to the optionee the opportunity to accept. *Frissell v. Nichols,* 94 Fla. 403, 114 So. 431, 433 (1927). Both the option and the underlying contract must be supported by consideration. *Donahue v. Davis,* 68 So.2d 163 (Fla.1953); *Koplin v. Bennett,* 155 So.2d 568 (Fla. 1st DCA 1963). In this case, the consideration for the option to bind Colonial to a six month extension was the $60,000 which Plantation had already paid.[5] Plantation was obligated to pay the additional $30,000 only if it chose *to exercise* its option and *to bind*

Colonial to the quoted rates for the extended period.[6] Viewed in this manner, it is clear that Colonial's contractual duty to quote a rate for the six month extension period was in no way dependent upon Plantation's payment of the $30,000. It would be absurd to say that Plantation should pay $30,000 for Colonial's commitment before Colonial has stated the terms, especially when Plantation had already paid Colonial $60,000 to do just that.

Thus, the trial court correctly left to the jury the decision of whether Colonial's quoted rate of 9¾% and 9 points was in compliance with Colonial's obligation to change its rates only if market conditions so demanded. The jury found in a special verdict that the interest rate and closing fees were not in compliance with the commitment letter.

Our inquiry on review is whether there was sufficient evidence to support the jury's decision. "[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Boeing Co. v. Shipman,* 411 F.2d 365, 375 (5th Cir. 1969) (footnote omitted). The evidence supports the jury's decision that Colonial's rate quotation did not comply with the contract. Plantation presented several witnesses who testified that the rates charged on projects comparable[7] to Plantation's were in the range of 9¾% interest and 3 points. In addition, money was available through the J. I. Kislak Company, one of the country's

---

**5.** This point is critical to our disposition of the breach of contract and damages issues. Colonial contends that the $60,000 was paid to it in return for its making mortgages available for the year 1974. However, a former Colonial officer testified at trial that both parties knew that the units would not be completed in 1974 and that therefore Colonial would not be called upon to make loans in the initial commitment period. It does appear curious that Plantation would pay $60,000 if it expected not to use the services. Plantation explains this by saying that it paid the $60,000 so that, when · the project was complete, it would be able to bind Colonial to two six month extensions of the commitment. This version becomes plausible when one realizes that in a wildly fluctuating

market (like that in 1974) lenders do not want to make six month commitments at fixed rates. Thus, from Plantation's view, when the project was near completion in early 1975, Plantation could look to Colonial to make a standing commitment even if the market were in a state such that no other lender would do so.

**6.** Colonial's market manager admitted that Colonial was under a duty to "offer an extension in accordance with the conditions and terms of the previous commitment."

**7.** While these projects were not identical to the project involved here, they provided to the jury a sufficient basis of comparison. *See* Fed.R. Evid. 401.

largest mortgage brokers, for permanent condominium loans at 9¾% interest and 3 points. Finally, an expert witness testified that points had been fairly constant at about 3½ to 4½% of the amount of the loan. Based upon this testimony, the jury reasonably could have found that Colonial's rate of 9¾% and 9 points was not in compliance with the contractual provision requiring quotations to be in accord with market conditions.

## II. DAMAGES

Colonial also attacks the verdict of $60,000 damages in favor of Plantation. Colonial asserts that even if it breached the contract, its performance prior to the breach was of some value to Plantation and therefore it should not be ordered to pay back the full $60,000 which it was paid. Colonial indicates two ways in which its performance benefited Plantation. First, the parties stipulated that one of the conditions upon which Plantation received its construction financing was that it had already acquired permanent financing.[8] Second, Colonial performed to the extent that it made loans available in 1974.[9] Even assuming that these contentions are correct, an award of $60,000 was still proper.

In its complaint, Plantation alleged two items of damages. First, Plantation claimed the $60,000 which it had paid to Colonial to issue the commitment. Second, Plantation sought recovery of $30,000 which it had paid as a broker's or finder's fee in order to locate a lender, Colonial. It alleged that Colonial knew that it had incurred this expense and that the loss of this amount was a foreseeable consequence of Colonial's breach. If both of these payments are properly compensable damages, an award of $60,000 is within the prerogative of the jury.

▮ Florida follows the rule of just compensation for breach of contract:

In actions for breach of contract, the aim is not the mere restoration to a former position as in tort, but is the awarding of a sum which is equivalent to the performance of the bargain; the attempt is to place the plaintiff in the position he would be in if the contract had been fulfilled.

*Ashland Oil, Inc. v. Pickard,* 269 So.2d 714, 723 (Fla. 3d DCA 1972), *cert. denied,* 285 So.2d 18 (Fla.1973). Thus, in Florida "[g]enerally, the correct measure of damages in a breach of contract action, is the loss of profits which would have resulted from the performance of the contract and which may be ascertained with a reasonable degree of certainty." *Ed Skoda Ford, Inc. v. P & P Paint & Body Shop, Inc.,* 302 So.2d 461, 461–62 (Fla. 3d DCA 1974), *cert. denied,* 315 So.2d 179 (Fla.1975). Lost profits, however, is not the exclusive measure of damages for breach of contract. Indeed, the nonbreaching party has the choice of recovering either loss of profits or damages which will put him in the same position as he was prior to making the contract. *Woroner Productions, Inc. v. Tourist Development Authority,* 256 So.2d 38 (Fla. 3d DCA 1971), *cert. denied,* 261 So.2d 843 (Fla.1972); *Sundie v. Lindsay,* 166 So.2d 152 (Fla. 3d DCA 1964), *rehearing denied,* 174 So.2d 629 (Fla.App.1965). In the latter case, a plaintiff may recover damages which were "reasonably foreseeable or contemplated by the parties as a result of the breach . . . ." *Olin's, Inc. v. Avis Rental Car System of Florida, Inc.,* 172 So.2d 250, 252 (Fla. 3d DCA 1965), *cert. denied,* Fla., 177 So.2d 482; *Popwell v. Abel,* 226 So.2d 418, 422 (Fla. 4th DCA 1969); *Hadley v. Baxendale,* 9 Exch. 341 (1854). Thus even though the plaintiff's expectation is not fulfilled by performance of the contract, he is not placed in a worse position than when he entered it.

The *Popwell* case is similar to the instant case. The defendant-buyer in *Popwell*

---

8. This is important to a construction lender because it provides greater assurance that his loan will be paid off through the proceeds of the permanent mortgage loans. See note 3, *supra.*

9. See note 5, *supra.*

breached a contract for the sale of a farm. In defense to an action by the seller, the buyer asserted that there were no damages since there was no difference between the value of the property on the date of the breach and its value on the date of the sale. The court, however, allowed the seller to recover the damages which he had incurred as a foreseeable consequence of the buyer's breach. These damages included the commission which the seller paid to the auctioneer who sold the farm.

In this case, as in *Popwell,* Colonial was aware when it entered the contract that Plantation would receive nothing for its $30,000 broker's fee and little for the $60,000 commitment fee if Colonial failed to perform. Therefore, the full broker's fee and part of the commitment fee were proper elements of damage for Colonial's breach of contract.[10] The jury, in awarding only $60,000 out of a possible recovery of $90,000, has reduced its award by what it assessed to be the value of the benefits which Colonial actually conferred upon Plantation. The valuation of the various elements of performance was properly a question for the jury, and since it is well supported by the evidence we will not upset the verdict.

## III. PRE–JUDGMENT INTEREST

Finally, Colonial contends that the trial judge erred in adding interest to the jury's verdict. The jury was not instructed with respect to interest, and the record does not reflect its inclusion in the award of $60,000 damages. In its final judgment, the trial court assessed interest as a matter of law.

In a diversity case, state law generally controls the award of interest. *E. g., Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Degelos Brothers Grain Corp. v. Fireman's Fund Insurance Co. of Texas,* 498 F.2d 1238 (5th Cir. 1974); *Texaco, Inc. v. Lirette,* 410 F.2d 1064 (5th Cir. 1969); *New Amsterdam Casualty Co. v. Soileau,* 167 F.2d 767 (5th Cir. 1948). Under Florida law, a party may recover pre-judgment interest on damages for breach of contract. *Shoup v. Waits,* 91 Fla. 378, 107 So. 769 (1926); *Vacation Prizes, Inc. v. City National Bank of Miami Beach,* 227 So.2d 352 (Fla. 2d DCA 1969). However, the Florida Supreme Court has stated with respect to actions for unliquidated damages:

> Although interest upon the amount found to be due by the jury, from the due date to the date of the verdict, is allowable as an element of damage, like all other elements of damage it must be ascertained by the jury and assessed in the verdict. In an action of this nature, there being no reference to interest in the verdict, there is no authority, in entering up the judgment thereon, to add to the sum assessed by the jury as damages an additional sum for interest thereon.

107 So. at 770. This rule of law is firmly established in Florida jurisprudence. *See, e. g., Bryan and Sons Corp. v. Klefstad,* 265 So.2d 382 (Fla. 4th DCA 1972); *Wabash Fire & Casualty Insurance Co. v. Holloway,* 139 So.2d 145 (Fla. 3d DCA 1962); *Bailey v. Swartz,* 97 So.2d 310 (Fla. 3d DCA 1957), *cert. denied,* 102 So.2d 728 (Fla.1958). On the other hand, a judge may add interest to

---

**10.** A fuller explanation of our view of the $60,000 damages may be in order. We hold in Part I of this opinion that Colonial made two promises to Plantation in return for the $60,000. First, it agreed to grant mortgages at a fixed rate for 1974. Second, it agreed to offer to extend its commitment for two successive, six month periods covering the year 1975. Colonial has complied only with its first promise. Plantation argued to the jury that the first promise was worthless since both parties knew that the project would not be completed in 1974 and that Colonial would not be asked to loan any money. Plantation contended that it paid the $60,000 in return for the extension so that money would be available to purchasers when the project was finished. On the other hand, Colonial asserted that it was paid $60,000, solely or in large part, for the first promise, which it fulfilled. It is impossible for this court to adopt either of the foregoing theories as a matter of law. Both parties presented evidence on the issue and the jury determined that the damages were $60,000. The verdict leaves unclear to what extent the damages represented a return of the $60,000 and to what extent they represented an award for the $30,000 broker's fee. Since we hold that both elements of damages were properly left to the jury, this ambiguity is insignificant.

a jury's award for liquidated damages.[11] *Fort Pierce Toyota, Inc. v. Wolf,* 345 So.2d 348 (Fla. 4th DCA 1977) (interest allowed on amount due on check); *Tucker v. Hughey,* 6 F.R.D. 545 (S.D.Fla.1947) (amount of damages stipulated). Where damages are unliquidated, no definable debt is due until liability is established. In such a case, Florida leaves with the jury the question of interest as an element of damages. Under Florida's concept, the awarding of interest is neither a ministerial task nor a question of law.

 As a general rule, the distribution of functions between the judge and the jury is a matter determined by federal law. *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *Herron v. Southern Pacific Co.,* 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931) (pre-*Erie*); *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969); *ABC–Paramount Records, Inc. v. Topps Record Distributing Co.,* 374 F.2d 455 (5th Cir. 1967). In *Byrd,* the Supreme Court answered the question of whether, in a diversity action, the court or a jury should decide whether the defendant was a statutory employee under South Carolina law and therefore entitled to immunity from suit. South Carolina law provided that the question must be decided by the court. The federal district court allowed the jury to decide the issue. In holding that federal law required the question to be left to the jury, the Court looked to respective state and federal policies which might be affected. First, the Court found that the South Carolina rule was not "bound up with the definition of the rights and obligations of the parties." *Id.* 356 U.S. at 536, 78 S.Ct. at 900. It was "merely a form and mode of enforcing the immunity . . . ." *Id.* Second, the Court recognized a "strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts." *Id.* at 538, 78 S.Ct. at 901.

The trial judge's award of interest as a matter of law appears initially to open the Pandora's box of *Erie* problems. However, before the battle lines are drawn, *Byrd* requires us to investigate whether there is an actual conflict between federal and state practice in this area.

 According to the applicable Florida law in this case, pre-judgment interest on damages for breach of contract is merely another element of damages to be determined by the jury. Under federal law, *Erie* requires that state law govern which elements of damages are available for the jury's consideration. *See Weakley, v. Fischbach & Moore, Inc.,* 515 F.2d 1260 (5th Cir. 1975). Our sister Circuit has held that where state law provides that interest may be awarded by the jury as a matter of discretion, a federal court in diversity must also allow the issue to be tried to a jury. *Hertz v. Graham,* 292 F.2d 443 (2d Cir. 1961). *See Newburgh Land & Dock Co. v. Texas Co.,* 227 F.2d 732, 735 (2d Cir. 1955); *Roth v. Fabrikant Bros., Inc.,* 175 F.2d 665, 669 (2d Cir. 1949). We are aware of no reason why a federal litigant in a diversity action may secure a jury trial for some elements of its damages but not for others.[12] No federal policy is served by draw-

11. For an excellent discussion of the distinction, see *Moore-McCormack Lines, Inc. v. Richardson,* 295 F.2d 583 (2d Cir. 1961), *cert. denied,* 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962).

12. The instant case is distinguishable from two earlier cases in this area. In *Peter Kiewit Sons' Co. v. Summit Construction Co.,* 422 F.2d 242 (8th Cir. 1969) (applying South Dakota law), a federal court sitting in diversity added pre-judgment interest to the jury's award of damages. In *Glick v. White Motor Co.,* 458 F.2d 1287 (3d Cir. 1972) (applying Michigan law) a federal court sitting in diversity corrected a judgment under Federal Rule of Civil Procedure 60(a) to provide for pre-judgment interest. In both cases the defendants contended that the issue should have been decided by the jury. Both courts allowed the matter of the plaintiff's pre-judgment interest to be decided by the trial court. The basis for the decisions was that, under state law, the award of pre-judgment interest was purely a ministerial or arithmetical function not involving discretion by jury. 458 F.2d at 1294; 422 F.2d at 272. In contrast, Florida provides that the award of interest in this case is a discretionary function within the exclusive province of the jury. Due to the differences in the state laws, these two cases are inapposite.

ing this distinction. Indeed, federal interests, as expounded in *Byrd*, would also require that the question be left to the jury. Thus, we find no basis for departing from Florida practice, and we are therefore *Erie*-bound to apply Florida law. If Plantation intended to seek pre-judgment interest, it was obligated to present that question to the jury as an element of damages. This was not done.

Accordingly, we hold that it was error to award pre-judgment interest as a matter of law.

## IV. FRAUD

■■■■ Plantation cross-appeals the trial court's directed verdict against it on the fraud count. One of the elements of fraud is the intent to deceive. *Donovan v. Armour & Co.*, 160 Fla. 62, 33 So.2d 601 (1948); *Hendricks v. Stark*, 99 Fla. 277, 126 So. 293 (1930). The intent to deceive may be proved by circumstantial evidence. *Florida East Coast Ry. Co. v. Thompson*, 93 Fla. 30, 111 So. 525 (1927); *Phifer v. Steenburg*, 66 Fla. 555, 64 So. 265, *rehearing denied*, 64 So. 265 (1914) (deficiency in acreage, as represented by the seller, may be so large as to raise inference of fraud). "But since honesty, not fraud, is presumed, neither courts nor juries may suppose the existence of fraud, where the facts established by the manifest weight and probative force of the evidence may be fairly and reasonably reconciled with honesty and pure dealing." 111 So. at 528 (granting defendant's motion for new trial on basis that jury verdict was contrary to weight of evidence). Although such action is not condoned, a mere broken promise does not constitute fraud. *Cf. Brod v. Jernigan*, 188 So.2d 575 (Fla. 2d DCA 1966) (broken promise does not establish fraud for purpose of suspension of real estate broker's license). Courts are reluctant to label common business decisions as fraud. *Sponholtz v. Sponholtz*, 190 So.2d 572 (Fla.1966) (change of business organization from partnership to corporation does not support theory of fraudulent conveyance).

Plantation's theory is that Colonial entered into the commitment with the expectation of honoring its obligation only if mortgage money was readily available. According to Plantation, Colonial caused the contract to be drafted in such a way that it could escape its obligations by passing through to Plantation the increased costs of obtaining mortgage money in a tight market, thus shifting to Plantation the risks of market fluctuations. Plantation points to a number of facts which it claims support this theory. First, at the time it issued the commitment, Colonial knew that it did not have the money which it promised to make available. For this reason, Colonial's president opposed the issuance of the commitment. Second, Plantation asserts that the commitment is not reasonably subject to the interpretation that Colonial could pass on to Plantation the costs of obtaining money in the secondary market: "While Colonial drafted the rate-revision clause to give the appearance that rates were tied to primary market conditions, Colonial intended from the beginning . . . to use the clause as an 'out' to supply Colonial with some arguable basis when it dishonored its commitment." [13] Other than Colonial's differing interpretation of the contract, Plantation does not indicate any misrepresentations made by Colonial. Finally, Plantation points to a number of Colonial's business decisions as proof of Colonial's intent not to honor its contract: Colonial did not apply to Mortgage Guaranty Insurance Company, one of its primary sources of funds, for mortgage money; Colonial "failed to check market conditions" with a few sources which Plantation considers to be excellent; although Colonial usually "earmarked" money for particular projects when money was scarce, Colonial did not do so in this situation.

■■■■ The proof proffered by Plantation simply does not establish a prima facie case of fraud. It is not uncommon for lenders such as Colonial to obligate themselves for future loans without having such funds in

---

**13.** Appellee's brief at 55.

hand. Likewise, the charge of fraud is not supported by the mere fact that one member of a business organization, in this case the president, disagrees with a course of action. Our economic system thrives on debatable, but potentially successful business decisions such as this. We also do not agree with Plantation's second assertion. The commitment does not so clearly delineate Colonial's responsibility that a differing construction of it would evidence fraudulent intent. Colonial's interpretation is not one of those actions which is so suspect that it sufficiently raises an inference of intent to deceive. *See Phifer v. Steenburg*, 64 So. 265 (Fla.1914). With respect to the remaining "indicia of fraud" presented by Colonial, suffice it to say that this is not a negligence case. We refuse to hold that because Colonial did not conduct its business in a manner acceptable to Plantation or to the proverbial reasonable man, it has perpetrated a fraud against Plantation.

We do not lightly approve the removal of factual determinations from the jury. However, in this case Plantation has failed to raise even by circumstantial evidence a legitimate inference of intent to deceive, and it has failed entirely to prove this intent by direct proof. Intent to deceive cannot arise from ordinary business decisions and dilemmas without some proof of sinister intent to fill in the picture.

The jury verdict is affirmed. The award of pre-judgment interest is vacated. The dismissal of the fraud count is affirmed.

AFFIRMED IN PART and VACATED IN PART.