The **LINCOLN NATIONAL LIFE INSURANCE COMPANY, Provident Life and Accident Insurance Company, Provident Mutual Life Insurance Company of Philadelphia and Life and Casualty Insurance Company of Tennessee, Plaintiffs-Appellants, Cross-Appellees,**

v.

**NCR CORPORATION, Defendant-Appellee, Cross-Appellant.**

**Nos. 84–2041, 84–2057.**

United States Court of Appeals, Seventh Circuit.

Argued May 22, 1985.

Decided Aug. 29, 1985.

William L. Sweet, Barrett, Barrett & McNagny, Ft. Wayne, Ind., for plaintiffs-appellants, cross-appellees.

Robert P. Johnstone, Barnes & Thornburg, Indianapolis, Ind., for defendant-appellee, cross-appellant.

Before BAUER and COFFEY, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

BAUER, Circuit Judge.

This case involves an alleged failure by Defendant NCR to honor a mortgage loan commitment issued by plaintiffs-lenders. NCR Corporation intended to build a world headquarters on the banks of the Greater Miami River in Dayton, Ohio. To that end, in 1975 NCR secured the services of the United California Mortgage Company (UCM) to obtain financing for its new project. UCM promptly lined up the plaintiffs in this case as lenders: The Lincoln National Life Insurance Co. (Lincoln); Provident Mutual Life Insurance Co. (Provident Mutual); Provident Life & Accident Insurance Co. (Provident Life); and Life & Casualty Insurance Co. of Tennessee (Life & Casualty). After a good deal of negotiations and exchanges of papers and signatures, all of which are now a matter of dispute, plaintiffs thought they had a con-

[*] The Honorable William J. Campbell, Senior Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

tract to finance the construction of NCR's headquarters. We do not know what NCR thought it had, but we do know that in January 1976 in Dayton, Ohio, D.W. Russler, the Treasurer of NCR, made that always delightful discovery of an extra $200,000,000 cash on hand. Russler immediately formed an Excess Cash Committee, which loyally voted to spend the excess cash on construction of the world headquarters. NCR then notified plaintiff that because of Mr. Russler's happy discovery, NCR would not need outside financing. The plaintiffs, angry at having to erase the NCR loans from all of their flow charts, filed suit in the Northern District of Indiana, alleging that NCR had failed to consummate the mortgage loan commitment, and seeking damages or specific performance. After a two day bench trial, the District Court for the Northern District of Indiana held that the mortgage loan commitment was a contract which NCR had breached. The court looked carefully for some damage to plaintiffs, but finding none, suggested instead that plaintiffs ought to have been happy to have lucked out of what now looks in retrospect to have been a bad investment. Undeterred by the court's optimistic wisdom, the lenders appeal, arguing that the district court erred in holding that they had failed to prove damages. NCR on appeal applauds the district court's reasoning on damages but suggests on a cross-appeal that the court erred in even finding a contract. We affirm.

## I

In 1975 NCR sought a loan of $14,000,000 to finance the construction of their world headquarters. NCR agreed to pay UCM a fee of one-half of one percent of the principal amount of the loan for UCM's services in securing lenders for the financing of the NCR headquarters. Thereafter UCM operated as an intermediary between the parties and arranged the participation amounts per party, the loan terms, and interest rates. Plaintiff Lincoln requested and received a good faith deposit of $50,000 from NCR in order to insure that UCM

would act for NCR. The plaintiffs then secured approval for their loans from their respective loan committees, and, receiving such approval, placed the NCR loan on their cash flow charts.

On November 5, Lincoln, on behalf of all the plaintiffs, issued a Mortgage Loan Commitment to NCR which set forth various terms and conditions of the loan. The commitment provided for a loan of up to $14,000,000 at an interest rate of 9⅞ for a term of 25 years. A specified portion of the loan was to be provided for by each plaintiff. The Mortgage Loan Commitment began by stating that the plaintiffs "have approved your application for a mortgage loan subject to fulfillment of and compliance with the terms and conditions of this letter." The paragraph concerning the "funding and commitment expiration date" provides that "NCR agrees to take the loan funds down no later than the fourth quarter of 1976," and that if the loans were not taken by December 31, 1976, the "commitment and Lenders' obligation under it shall terminate by that date unless the expiration date is extended in writing by Lenders."

The commitment also made reference to NCR's good faith deposit in the following language: "Lenders hereby acknowledge receipt of the sum of $50,000 submitted by NCR as a good faith deposit. It is understood and agreed that this deposit will be refunded immediately upon NCR's acceptance and return of this commitment." Above NCR's Vice-President's signature was the sentence: "The undersigned has read, approved, and accepted the foregoing mortgage loan commitment, including the general conditions," noting in addition that this acceptance was conditioned on the enclosed amendments. The commitment was signed by Charles Marcus of Lincoln on behalf of the plaintiffs. NCR's Vice-President executed its acceptance of the commitment on November 17, 1975, subject to amendments which it had attached regarding prepayment premiums and other conditions of the agreement. Acceptance of the commitment was made expressly subject to

the approval of the Board of Directors of NCR. On November 19, 1975, the Board of Directors authorized and directed the officers of NCR to execute the mortgage. On December 30, 1975, NCR wired the $70,000 fee to UCM and on the same day NCR sent clarifications of NCR's proposed amendments.

On January 20, 1976, the plaintiffs executed the clarifications, sent the executed clarification document to NCR and returned the $50,000 good faith deposit to NCR. Plaintiffs then drafted and executed a loan participation agreement amongst themselves as required, and planned for funding the loan.

During January and February, when NCR recognized its unexpected cash surplus, the interest rates had also declined, so that NCR began to reconsider the terms of the plaintiffs' loan. On April 23, 1976, NCR sent two letters of authorization to UCM. The first letter, not to be disclosed to the plaintiffs, authorized UCM to renegotiate the NCR loan with plaintiffs at a rate not to exceed 9⅜% in return for a sliding scale fee which depended on the size of the reduction in the interest rate. Alternatively, UCM could earn a fee by negotiating a penalty for NCR's cancellation of the commitment. The second letter, also dated April 23, 1976, which could be disclosed to the plaintiffs, authorized the renegotiation of a mortgage loan in the amount of $13,000,000 at a rate not exceeding 9⅜% annually and also specified that "NCR should have the opportunity to consider a reasonable penalty fee to cancel the loan."

On May 14, 1976, UCM sent a letter to Lincoln stating that a letter from NCR was enclosed "with a real sense of regret." The letter from NCR to UCM was dated May 10, 1976, and stated that NCR did not need the money and that NCR could not "justify consummating a loan at a rate significantly above the market when the fund will not even be required for some time." In its letter, NCR specifically pointed out that 9⅞% was "extremely high by today's standards" and that NCR should not consummate a loan at that interest rate

when "the same deal could be done today for less than 9%, and even that figure is improving almost daily." The letter suggested cancellation of the arrangement with a reasonable damage payment to the lenders or "a new arrangement with an interest payment in tune with the current market."

These letters were the first notice that plaintiffs received with respect to NCR's desire to avoid consummating the loan agreement as written and to renegotiate its terms. On May 26, 1976, plaintiffs responded with a letter directly to NCR. That letter stated that there was an enforceable contract and insisted that the loan be consummated.

In July 1976, the plaintiffs removed the NCR loan from their cash flow charts. Since the plaintiffs expected to fund the loan to NCR from cash flow, no funds were ever set aside specifically to be loaned to NCR. After NCR decided not to borrow the funds, the cash flow which would have funded the loan became available as part of the total investment activity of the plaintiffs. The record indicates that the plaintiffs made a variety of investments after the NCR loan was removed, some of which returned a higher yield than the NCR loan would have returned, whereas others returned a lower yield. Testimony at trial indicated that because of subsequent increases in interest rates, the loan to NCR, if it had been made, would have been a bad investment.

In mid-July NCR told plaintiffs in a letter that NCR was not prepared to proceed with the loan, and on October 19, 1976, NCR informed the plaintiffs that further correspondence should be directed to their legal department. The loan was never made and on March 29, 1977, this lawsuit was filed by the lenders seeking damages or specific performance. On May 23, 1984, after a two day bench trial, the district court, 603 F.Supp. 1393 (N.D.Ind.1984), issued its order finding that the mortgage loan commitment was an enforceable contract obligating NCR to borrow the funds and that NCR was liable to plaintiffs for its breach

of that obligation. The court also found that plaintiffs were not entitled to damages from NCR's breach. The lenders appealed.

## II. ENFORCEABILITY OF COMMITMENT

The district court held that the mortgage loan commitment was a contract obligating the lenders to lend and the borrower to borrow. The court looked to parol evidence to reach this result, finding that the contract on its face was ambiguous. The court relied specifically on several pieces of evidence to establish the contractual nature of the commitment. First, the court noted that the plaintiffs, in conferring amongst themselves over the draft of the original commitment letter, had considered and rejected a "1% refundable fee to anchor the deal" on the grounds that "NCR is regarding the commitment as a contract." Op. at 20. Second, the court recognized testimony that indicated that NCR knew that the lenders would be "unhappy" if NCR did not go through with the deal. Third, the fact that Board approval had been required by NCR suggested the importance of the contract to NCR. Finally, the payment of and plaintiffs' refunding of the "good faith deposit" revealed "the binding nature" of the commitment.

The defendant proposed two arguments in support of the proposition that no binding contract existed, but the court rejected both of them. The court found that the absence of a commitment fee was not determinative of the nature of the contract because its only purpose would have been to serve as liquidated damages had NCR breached the agreement. The court found further that the absence from the contract of the words "NCR agreed to borrow" does not mean that there cannot be a contract on the basis of the language used and the conduct considered.

On its cross-appeal, NCR argues that the court erred in considering extrinsic evidence because the mortgage loan commitment is plain on its face and not ambiguous. NCR argues that the plain meaning of the commitment gave NCR an option to borrow money, but did not obligate it to borrow. NCR argues that a contract must be strictly construed against the drafting party, in this case the plaintiffs, and that therefore the absence of specific language requiring NCR to borrow is critical. The plaintiffs argue further that the language of the funding provision, "NCR agrees to take the loan funds down no later than the fourth quarter," is not ambiguous. When read in the context of the agreement the phrase merely states one of the numerous conditions NCR would have to perform if NCR decided to borrow funds from the plaintiffs. NCR argues that the commitment offered an option to borrow, and that while no commitment fee was required by the plaintiffs to keep the deal open, nonetheless the performance of the conditions enumerated in the agreement by NCR would have been sufficient consideration to keep the contract open. NCR concludes therefore that it cannot be held liable for refusing to exercise this option.

We find much that is appealing in NCR's argument. Case law on the nature of the mortgage loan commitments is scarce with an apparent variety of holdings, as various presumably as the commitments they interpret. *See, e.g., Plantation Key Developers, Inc. v. Colonial Mortgage Co. of Indiana, Inc.*, 589 F.2d 164 (5th Cir.1979) (option contract); *Stanish v. Polish Roman Catholic Union*, 484 F.2d 713 (7th Cir. 1973) (binding contract); *Dubin Weston v. Louis Capano & Son*, 394 F.Supp. 146 (D.C.Del.1975) (bilateral contract); *Johnson v. American Nat'l Life Ins. Co.*, 126 Ariz. 219, 613 P.2d 1275 (1980) (option contract); Wolf, *The Refundable Commitment Fee*, BUS.LAW 1065, 1066 (1968) (most loan commitments are option contracts). We need not, however, decide the issue raised by NCR in its cross-appeal here. Because we hold that the district court was correct in holding that the plaintiffs proved no damages from NCR's conduct, it is not necessary to decide whether the commitment in this case was a mutually binding contract or a promise of the plaintiffs to lend if NCR opted to borrow.

We assume for purposes of discussion of the damages issue that the mortgage loan commitment was a contract.

### III

■ Jurisdiction in this case is based on diversity. 28 U.S.C. § 1332. Damages must, therefore, be assessed according to Indiana law because Indiana courts and federal courts applying Indiana law use the doctrine of *lex fori* to damages. *See Prudence Life Insurance Co. v. Morgan,* 138 Ind.App. 287, 213 N.E. 900 (1966). Under Indiana law, the burden of pleading and proving damages rests with the plaintiff. *Rauch v. Circle Theater,* 176 Ind.App. 130, 374 N.E.2d 546, 553 (1978). A mere showing of a breach of contract does not necessarily entitle a plaintiff to damages.

> It is an elemental rule of law that, while a plaintiff will not be denied a recovery merely because of uncertainty as to amount or valuation, in dollars, of the injury suffered, he is limited, ultimately, only to such relief as the evidence will support.... The party injured by the breach of contract is limited in recovery to the loss actually suffered by the breach.

*Rauch,* 374 N.E.2d at 553 (*quoting Irving v. Ort,* 128 Ind.App. 225, 146 N.E.2d 107 (1957)). *See also Gewartowski v. Tomal,* 125 Ind.App. 481, 123 N.E.2d 580, 582 (1955). In *Rauch,* for example, the plaintiff-lessor sued a commercial lessee alleging that the dissolution of the lessee corporation and assignment of its interest in the lease to its manager-corporation constituted an anticipatory breach of the lease contract entitling the lessor to damages. The court held that the lessors had proved no damages because the assignee had performed all the covenants in the lease and there was no evidence of bad faith in the assignment. In *Gewartowski* the court found that the defendants had breached a covenant not to compete, but that plaintiffs had failed to prove that the defendants' new restaurant had impaired the goodwill of their restaurant, or that there had been

a loss of profits or a loss of value in the property due to the breach.

■ Findings by a district court as to the fact of proof of damage are findings of fact not to be set aside on appeal unless clearly erroneous. Fed.R.Civ.Proc. 52(c). An Indiana court, reviewing a judge's award of damages "will not disturb an award of damages unless it is not within the scope of the evidence, or unless it appears that the award was motivated by prejudice, passion, or the consideration of improper evidence." *Friendship Farms Camps, Inc. v. Parson,* 172 Ind.App. 73, 359 N.E.2d 280, 284 (1977); *Babson Bros. Co. v. Tipstar Corp.,* 446 N.E.2d 11, 15 (Ind.App.1983). This court, in considering the standard of review where the district court denied damages, stated that the party complaining of error in the findings of the trial court "must demonstrate the error with something more than general assertions.... A reviewing court will not make its own search of the record to determine whether such general assertions are supportable." *George E. Hoffman v. Internat'l Brotherhood of Teamsters,* 617 F.2d 1234, 1247 (7th Cir.1980).

■ Indiana law also provides that plaintiffs have the burden of mitigating damages. *Allen Heaton & McDonald, Inc. v. Castle Farm Amusement,* 151 Ohio St. 522, 86 N.E.2d 782 (Ind.S.Ct.1949); *see also* 11 *Williston on Contracts,* § 1353 p. 274 (3d ed.). Where an agreement to lend money is breached, obtaining a substitute loan constitutes mitigation. Indiana courts have held that the measure of damages for the breach of such an agreement is generally the difference between interest on the contract note and interest the non-breaching party incurred or earned in a substitute loan. *Downing v. Dial,* 426 N.E.2d 416 (Ind.App.1981); *Doddridge v. American Trust & Savings Bank,* 98 Ind.App. 334, 189 N.E. 165 (1934).

The plaintiffs in this case sought damages in the amount of $1,200,000 in their original complaint, framing the damages suffered as "lost profits and lost interest." The plaintiffs also originally sought specif-

ic performance as an alternative remedy to damages, but on January 18, 1979, plaintiffs moved to amend their complaint by dropping Count II for specific performance. The plaintiffs gave no explanation for their request and presiding District Judge Jesse Eschbach granted the motion without comment.

After trial, the district court found that plaintiffs had made a claim for "expectation" interest, that is, for damages to put plaintiffs in the position that they would have been in had the loan been taken down. The court found that the plaintiffs had made no claim for damages for detrimental reliance on the defendants to the extent that their employees expended effort on the loan commitment. The court found that the expectation interest claimed by plaintiffs at trial was $1,783,709 plus prejudgment interest of 8% per year. Interestingly, on appeal, the plaintiffs do not specify anywhere in their briefs the exact amount, or at least alternative amounts, of the damages they suffered and are now seeking. They ask instead that we reverse and remand the lower court's order denying damages, instructing the court on remand "to enter a money judgment in favor of plaintiffs in an amount based on the present value of the difference between the interest which would have been earned on the NCR loan and the interest which would have been earned on a comparable loan as of December 1976 plus prejudgment interest." P.Br. at 48.

The district court found that the plaintiffs in this case failed "to prove that they have, in fact, been damaged." Op. at 34. To reach this finding, the court reviewed the plaintiffs' lending procedures and their testimony as to the use of these procedures in this case. The court found that when plaintiffs obtain a loan, they place proposed loans on a cash flow chart, which projects estimated future lending dates, so that they will be sure to have funding at the appropriate time. The court found that plaintiffs in this case placed the NCR loan on the charts before committee approval and removed it from the chart within two months after NCR's notification that it did not intend to take down the funds. The court concluded that, based on this evidence, the "proposed funding for NCR was nothing more than a paper transaction." Op. at 35. No investments were changed at its inclusion, and any money which would have gone to NCR was invested elsewhere. The court concluded, however, that based on the testimony, it "is impossible to determine" the nature, terms and yield of the substitute investments. Op. at 36. The plaintiffs concede as much in their briefs to this court: "Since cash is fungible . . . it is impossible to trace the funds which would have been loaned to NCR into some other substitute investment." P.Br. at 12. The court concluded therefore that because the plaintiffs had not proven that "the NCR breach had any effect on their investment opportunities, they have not shown entitlement to damages for their expectation interest." Op. at 38–39.

On appeal to this court, the plaintiffs do not directly challenge the district court's holding that they failed to prove the fact of damages. As we have shown above, however, questions of uncertainty of amount of damages are to be distinguished from questions of fact of damage. Plaintiffs reply that uncertainty as to amount of damages must be resolved against the wrongdoer. Within this context, the plaintiffs focus on the methodology employed by the district court when the court discussed what the plaintiffs' damages might be had they proven damages. The plaintiffs' argue, for instance, that the district court committed an error of law by looking at interest rates at the time of trial as opposed to the time of breach. Plaintiffs also argue that NCR had not met its burden of showing mitigation of damages, that damages are to be determined at the date of performance rather than the date of repudiation, and that the district court erred in finding that the minimum amount of damage was 2% of the loan principle, which amount plaintiffs argue is the customary amount in the industry paid for breaches of the loan commitment.

None of the plaintiffs' arguments are persuasive, or even on point. We cannot find any error with the district court's finding of no damages, or with its reasoning on reaching that result. The plaintiffs failed to show that they were in any way damaged by NCR's failure to honor the mortgage loan commitment.

In conclusion, then, for the reasons discussed above, we affirm the order of the district court denying the plaintiffs' claims for damages.

AFFIRMED.